## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **A.H.,** *a minor, by her next friend and mother,* Tracey Handling, | : |
| | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **3:17-CV-391** |
| | : **(JUDGE MARIANI)** |
| **MINERSVILLE AREA SCHOOL DISTRICT,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

This case arises out of a claim that Defendant, Minersville Area School District, prohibited Plaintiff, A.H., a transgender girl attending Minersville Elementary School, from using the girl's bathroom while at school or at school sponsored events. Plaintiff's two-count Amended Complaint asserts that the school district's "policy" of prohibiting A.H. from using the girl's bathroom while in first grade and at school-sponsored events, has violated A.H.'s rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.,* (Count I) and the Equal Protection Clause of the Fourteenth Amendment (Count II). (Doc. 10).[1]

---

[1] Plaintiff's Amended Complaint also alleges that "Defendant, MASD, continues to discriminate and retaliate against Plaintiff, A.H., by not providing her the necessary assessments required to determine her Individualized Education Plan (IEP) and the proper IEP so that she gets an appropriate education." (Doc. 10, ¶ 92; *see also, id.* at 2-3). However, during Mrs. Handling's deposition, her counsel acknowledged that "this is not an IDEA case" and stated that he was "withdr[awing] the paragraph". (Dep. of T. Handling, at 63).

Following the completion of discovery, Plaintiff filed a Motion for Partial Summary Judgment (Doc. 36) requesting summary judgment on all issues of liability and further requesting a permanent injunction. The Minersville Area School District also filed a Motion for Summary Judgment (Doc. 37), requesting summary judgment on all Counts of the Amended Complaint.

The parties have fully briefed the motions and they are ripe for decision. For the reasons set forth below, the Court will deny Defendant's Motion for Summary Judgment (Doc. 37) and grant in part and deny in part Plaintiff's Motion for Partial Summary Judgment (Doc. 36).

## II. Statement of Undisputed Facts

A.H. and the Minersville Area School District have each submitted a Statement of Material Facts (Docs. 36-2, 39) as to which they submit there is no genuine issue or dispute for trial, and each party has also submitted a Response to the moving party's Statement of Material Facts (Docs. 43, 42), with the result being that the following facts have been admitted except as specifically noted.[2]

---

[2] In reciting the material facts, the Court cites to only the moving party's statement of fact when that fact is undisputed. If a fact is only admitted in part, or admitted with a qualification, the Court cites to both the moving and non-moving party's statement of fact and the response thereto.

In addition, throughout each party's responses to the opposing party's statement of material facts, the non-moving party denies or "den[ies] as stated" certain statements that they contend are in dispute. However, to the extent that such denials do not address the stated material fact or merely disagree with a statement in an individual's properly quoted testimony, the Court will deem those asserted facts as admitted, and, where relevant, has included them in the statement of undisputed facts.

A.H. is a minor.  At the time the present action was filed in 2017, A.H. was attending second grade in the Minersville Area School District.  (Doc. 39, ¶ 1).  Tracey Handling is A.H.'s mother.  (*Id.* at ¶ 2).

Defendant, Minersville Area School District (hereinafter "MASD" or "the District"), is a public school district in Schuylkill County, Pennsylvania. It is organized under the laws and constitution of the Commonwealth of Pennsylvania. MASD at all times hereto functioned, under color of state law, as the executive administrative agency responsible for the orderly administration of the public schools within the School District, including, but not limited to the Minersville Elementary School, and was the entity responsible for institution of administrative rules regarding the conduct of the day-to-day business of the school within the MASD, including creation and implementation of policy and procedure.  (Doc. 36-2, ¶ 3; *see also*, Doc. 39, ¶ 3).

Dr. Carl G. McBreen is the MASD Superintendent, a position that he has held since 2013.  (Doc. 36-2, ¶ 4; Doc. 39, ¶ 4). Before becoming District Superintendent at Minersville, Dr. McBreen had been a high school principal from 2006-2013, assistant principal for the District from 2000-2006, and a teacher for nine years from 1990-1999. (Doc. 36-2, ¶ 5).  Dr. McBreen was first certified as a District Superintendent in 2004.  (*Id.* at ¶¶ 6-7).

James Yacobacci is the Principal for the MASD elementary school and has held this position since 2011.  (Doc. 36-2, ¶ 9; Doc. 39, ¶ 5).  Prior to that, Mr. Yacobacci was the Assistant Principal for the District.  (Doc. 36-2, ¶ 10).

A.H. is a transgender girl. When A.H. was born, she was born a biological male, however she has a female gender identity. (Doc. 36-2, ¶ 1; Doc. 39, ¶ 6). A.H. lives every aspect of her life, in and out of school, consistently and with her gender identity different than her sex assigned at birth. (Doc. 36-2, ¶ 2). The District does not dispute that A.H. is transgender or that she has been diagnosed with Gender Dysphoria. (*See e.g.*, Doc. 43, ¶¶ 36-40, 44-54, 58-73, 103-104, 132-142, 157-159).

According to the Diagnostic & Statistical Manual V ("DSM-V"), diagnostic criteria for "Gender Dysphoria in Children" are as follows:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least six of the following (one of which must be Criterion A1):
   1. A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender).
   2. In boys (assigned gender), a strong preference for cross-dressing or simulating female attire: or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.
   3. A strong preference for cross-gender roles in make-believe play or fantasy play.
   4. A strong preference for the toys, games, or activities stereotypically used or engaged in by the other gender.
   5. A strong preference for playmates of the other gender.
   6. In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games, and activities.
   7. A strong dislike of one's sexual anatomy.
   8. A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.
B. The condition is associated with clinically significant distress or impairment in social, school, or other important areas of functioning.

(Doc. 36-4, Ex. B, DSM-V, at 452).

When A.H. first enrolled in kindergarten in the District in the 2014-2015 school year, she was enrolled as a biological male. (Doc. 39, ¶ 7). However, at some point during kindergarten, A.H. received a clinical diagnosis of gender dysphoria. (*Id*. at ¶ 8). According to Mrs. Handling, she notified the District of A.H.'s diagnosis "[p]robably pretty much right when it happened". (Dep. of T. Handling, at 25). At that time, she "[e]xplain[ed] to [Mr. Yacobacci and Dr. McBreen] that [A.H.] want[ed] to be a girl" and asked whether it was "okay to allow [A.H.] to dress in full girl uniform", to which she was told yes. (*Id*. at 25-26).

A.H.'s transition specifically happened mid-year of A.H.'s kindergarten year, *i.e.,* January 2015. (Doc. 39, ¶ 11). A.H.'s birth certificate was also formally changed from male to female. (*Id*. at ¶ 12). At no time did anyone in the District resist or voice objection to the transition and at all times A.H. was treated as a female, the gender with which she identifies. (*Id*. at ¶ 13). A.H. was also permitted to dress however she desired, as long as it was consistent with the school dress code (regardless of male or female dress) and faculty immediately began using her chosen name of A.H. (*Id*. at ¶¶ 14, 16). (*See also*, Doc. 36-2, ¶ 27).

During A.H.'s kindergarten year, restroom use was not an issue since each kindergarten classroom contained a single-user, unisex restroom. (Doc. 39, ¶ 17; *see also*, Doc. 36-2, ¶ 74).

5

On May 27, 2015, near the end of A.H.'s kindergarten year, A.H. attended a school field trip to the Lehigh Valley Zoo. (Doc. 36-2, ¶ 75; Doc. 39, ¶ 21). Mrs. Handling did not volunteer to chaperone this field trip. (Doc. 39, ¶ 22; Doc. 42, ¶ 22). Mrs. Handling could not remember talking to anybody before the field trip about any restroom issues and she did not contact the Lehigh Valley Zoo to inquire as to any restroom policies and/or availability of restrooms. (Doc. 39, ¶¶ 23, 24; Doc. 42, ¶¶ 23, 24). Nonetheless, the District, without any prompting from Mrs. Handling, attempted to research family restrooms and their availability at the Zoo prior to the trip. (Doc. 39, ¶ 25). However, neither Dr. McBreen, Principal Yacobacci nor the classroom teacher, Ms. Schuster, informed either A.H. or her parents about any decision as to what bathroom A.H. could use on the field trip. (Doc. 36-2, ¶ 93).

According to Mr. Yacobacci, he and Dr. McBreen decided that "in the school and the school sanctioned event, [ ] the child should use a private and/or unisex bathroom." (Dep. of Yacobacci, at 64). If there was not a unisex or private bathroom available at a school sanctioned event, Mr. Yacobacci, in consultation with Dr. McBreen, informed Ms. Schuster to have A.H. "use the men's bathroom, but treat it as a private bathroom by not allowing anyone to come in for those few minutes." (*Id*. at 65). Mr. Yacobacci explained that he "didn't want a situation that could endanger A.H., because there's other people in the public who would be going to the bathroom", that he "also wanted again to protect the privacy rights of all students", and that his "concern was that someone else in the bathroom may identify her as a biological male and create issues that could create a safety concern for

A.H." (*Id*. at 66, 67). Mr. Yacobacci felt that "on the guidance that we had available, which was none, that that would be the best decision." (*Id*. at 81). Mr. Yacobacci admitted that there was no guidance with respect to any other students' use of off-campus public restrooms. (*Id*. at 77-78).

According to Dr. McBreen, with respect to the field trip to Lehigh Valley Zoo, he gave a "verbal directive to Mr. Yacobbaci, this is the way I want it handled." (Dep. of McBreen, at 47). Dr. McBreen explained his reasoning as follows:

> **Q**. How did you -- were you familiar at all in making this decision with what facilities were present?
>
> **A**. No. Again, I have no control over public bathrooms, bathrooms that are outside. No control over the public bathroom. But I got to be able to safeguard the children. I didn't care where the bathrooms were. I just knew that this was the procedure we were going to use on that particular day. . . .
>
> **Q**. What concern did you have about letting A.H. use the bathroom of her choice?
>
> **A**. Because in that particular time, there were many students again who knew she was a boy in that classroom. There were kids who knew she was [A*****]. Biologically she was a boy. By her going into -- they didn't know anything about the bathroom because the bathroom [in kindergarten] was in the classroom back at the home school.
>
> **Q**. Right.
>
> **A**. So when you go out in a public building, you go out into the public and you have a child who many perceive as being a boy going into a female bathroom, there may or may not be problems. Again, I wasn't going to take that chance. So I made the decision.

(*Id*. at 49-50). When questioned about the school district's interest in which bathroom A.H. was allowed to use in a public place, Dr. McBreen explained that it was his concern because he is

> responsible for the safety, health and welfare of all of the students. This was a situation that was brand new to the district. It was also brand new to us. There were many – there were kids in that classroom who went to school with her, her classmates who knew that . . . A.H. was a biological boy and changing her name from [A*****] to A.H. So I didn't want to call any concern to it. . . . I didn't want to call attention to the child because it would have been unwanted attention.

(*Id*. at 52-53) (*see also*, *id*. at 56-58 (further explaining his decision)).

A.H. used the restroom one time on the Lehigh Valley Zoo field trip. (Doc. 39, ¶ 28). Plaintiff asserts that when she used this restroom, A.H. was required to use the men's bathroom when there were males present in the bathroom. (*See e.g.*, Doc. 42, ¶ 29).[3] Nonetheless, it is undisputed that A.H. enjoyed the field trip to the zoo. (Doc. 39, ¶ 30; Doc. 42, ¶ 30).

The District was not aware of any issues until contacted the next day by Mrs. Handling via email with complaints about the manner in which A.H.'s bathroom use was addressed. (Doc. 39, ¶ 31).

---

[3] Plaintiff asserts that A.H. was "required to use a men's bathroom with males present in the facility" (Doc. 42, ¶ 29; *see also, id.* at ¶ 31). Plaintiff cites to the deposition of Mrs. Handling in support of this assertion. However, this deposition testimony fails to support Plaintiff's statement. Rather, Mrs. Handling explained that her daughter told her that at one point during the field trip, "all of the boys went into the bathroom. [A.H.'s] teacher stood outside. And once all of the boys came out, she said, okay, A.H. Now you can go." (Dep. of T. Handling, at 44). Thus, while there is testimony that other students observed A.H. enter the men's restroom, Plaintiff has pointed to no evidence that there were males present in the restroom at the time A.H. used it.

A.H. finished the remainder of kindergarten without incident. (Doc. 39, ¶ 32).

Prior to the start of first grade for the 2015-2016 school year, the District provided an opportunity for Mrs. Handling to meet with relevant administrators to address any concerns she had for the upcoming year concerning A.H.'s restroom use. (*Id.* at ¶ 33). A meeting was held and attended by, among others, Dr. McBreen, Mr. Yacobacci, Mrs. Handling, and Dr. Monika Parikh, A.H.'s pediatric psychologist. (Doc. 39, ¶ 34; *see also*, Doc. 36-2, ¶ 114). The purpose of the meeting was to have a conversation about ways to support A.H. at school and working together to address any needs A.H. may have. (Doc. 39, ¶ 35). Dr. Parikh's role, as A.H.'s treating psychologist, was to help the family collaborate and work with the school in supporting A.H. (*Id.* at ¶ 36).

The parties dispute what was said during the meeting, and specifically whether Mrs. Handling objected to the District's suggestion that the school set aside unisex bathrooms for A.H.'s use in first grade. (*See e.g.*, Doc. 36-2, ¶¶ 115-116, 120, 126; Doc. 43, ¶¶ 115-116, 120, 126; Doc. 39, ¶ 39; Doc. 42, ¶ 39) (*see also*, Dep. of McBreen, at 61-63; Dep. of Yacobacci, at 93-93; Dep. of T. Handling, at 50-51).

Nonetheless, it is undisputed that during the Spring, 2015, meeting, McBreen commented to Mrs. Handling that there was no formal guidance (at least not initially) as to how best address her request for an accommodation (Doc. 39, ¶ 37; Doc. 42, ¶ 37), and that McBreen also stated that these individualized requests are handled on a case-by-case basis in the absence of any overarching formal guidance (Doc. 39, ¶ 38).

In May 2016, during A.H.'s first grade year, she attended a school field trip to Hershey, PA. The field trip was announced in March, 2016. (Doc. 39, ¶ 40; Doc. 42, ¶ 40; Doc. 36-2, ¶ 152). Near the time the field trip was announced, Tracey Handling contacted Yacobacci regarding A.H.'s access to women's restrooms while attending that field trip. (Doc. 36-2, ¶ 143). At some time prior to the field trip, the District advised Mrs. Handling that a unisex/private bathroom would be available for A.H's use on the trip. (Doc. 39, ¶ 41; Doc. 42, ¶ 41; *see also*, Doc. 36-2, ¶ 154; Doc. 43, ¶ 154; Dep of Yacobacci (stating that "[a]t that time we still had the policy, the procedure of using the unisex bathrooms" and that he told Mrs. Handling "this is a school event, if [A.H. is] going on a school event, then there is at the Hershey Zoo a private bathroom.")). Mrs. Handling objected to A.H. not being allowed to use the women's restroom and elected to accompany A.H. to the Zoo in order to ensure that A.H. could use the restroom corresponding to her gender identity. (Doc. 36-2, ¶¶ 153, 155). No one from the District opposed or objected to this. (Doc. 39, ¶ 43). During that field trip, A.H. used the women's restroom facilities, accompanied by her mother, without incident. (Doc. 36-2, ¶ 156; *see also*, Doc. 39, ¶ 43).

The parties agree that once the United States Department of Education and Department of Justice issued a formal "Guidance" letter in May 2016, which in pertinent part stated that transgender students should be permitted to use the restroom of the gender to which he or she identifies, MASD immediately permitted A.H. to use the female restroom or the unisex restroom, whichever she so desired. (Doc. 39, ¶ 44). Although Defendant

asserts that this has been, and continues to be, the District's approach to accommodating A.H.'s restroom needs and that A.H. recently finished third grade in the District without incident (Doc. 39, ¶ 46), Plaintiff claims that the District has not promulgated any written policy that would assure that A.H. will continue to be granted this right in the future (Doc. 42, ¶ 46). Nonetheless, at this time A.H. continues to be permitted to use the restroom facility of her choice at school. (Doc. 39, ¶ 45). According to Mr. Yacobacci, the school does not have any present plans to withdraw the ability of A.H. to use the girls' bathrooms at the elementary school "unless we get a Federal directive." (Dep. of Yacobacci, at 123-124). However, he did not believe that A.H.'s needs with respect to what will occur in junior high school or high school has been "addressed or even considered." (*Id*. at 124).

With respect to the creation of a policy statement or rule which would allow students to use the facilities associated with their gender identity, Dr. McBreen stated that he would not do so because "we have not received full direction yet from anybody still. Other than President Obama, no one has given us any type of direction as to what to put in that policy. Because that is one of the things that are safeguarded by is our policies. We have not received any information regarding that." (Dep. of McBreen, at 71). Dr. McBreen further explained:

> When I receive some type of direction, I will weigh that against the safety, health and welfare. And I'll make decisions as I collect the data. I do a lot of data driven decision making.
> So I don't have any data. There's nobody that can offer me any data. This case, we're talking four years ago, and they still have not come out with any type of

> policy that makes sense. And PSBA is usually the first and I look every year to see if it's coming out and I get the updates, and nothing.

(*Id.* at 72).

In approximately February of 2016, the District voluntarily agreed to receive education and training on various topics, including transgender student and bathroom policies offered by the Bradbury-Sullivan LGBT Community Center, to provide education and training to the District. (Doc. 39, ¶ 47).

From 2014 to 2017, A.H. met with Dr. Monika Parikh a number of times. A.H. began treatment with Dr. Parikh on November 3, 2014, when she was listed as a 5-year-old male. (Doc. 36-2, ¶¶ 34, 35). A.H. continued treatment with Dr. Parikh between November 3, 2014 and January 13, 2015, and during this time, A.H.'s treatment included counselling for gender related concerns such as wearing traditionally female clothing, preference for traditionally female toys and accessories, and wanting to be called by a traditionally female name. (*Id.* at ¶¶ 43, 44). On January 13, 2015, A.H., now age 6, was seen by Dr. Parikh. During this visit A.H. requested that her given name be changed on her birth certificate to a traditionally female name. (*Id.* at ¶¶ 45, 46).

A.H. was seen again by Dr. Parikh on January 27, 2015. At that time, Dr. Parikh noted that "a diagnosis of Gender Dysphoria in Children will be given to reflect [A.H.]'s preference for traditionally female toys, clothes, etc." (Doc. 36-2, ¶¶ 53, 54).

On February 25, 2015, A.H. was seen by Dr. Parikh. As of this visit, A.H.'s name on her birth certificate had been changed to her current, female name. During this session, Dr.

Parikh remarked on the observations that she and A.H.'s parents had made in A.H.'s improvement in mood and behaviors between sessions following increased self-expression and acceptance by school personnel for A.H. to wear traditionally female clothing to school as her uniform. (Doc. 36-2, ¶¶ 59, 63, 67). A.H. was also seen by Dr. Parikh on March 25, April 14, and May 26, 2015. (*Id.* at ¶¶ 68, 71, 103).

A.H. was again seen by Dr. Parikh on September 23, 2015. During this session, Dr. Parikh noted discussions of previous concerns and problem-solved issues for future situations, such as field trips, and concerns related to school personnel having A.H. use the boy's bathroom during the end of the school year field trip. While Dr. Parikh noted that they "[d]eveloped a plan for future field trips through school including expectations for which bathroom she will use (boy or girl) and ensure that [A.H.] uses the bathroom by herself," Dr. Parikh's concern was "to not cause issues with other parents." (Doc. 36-2, ¶¶ 132, 133, 134).

A.H., now age 7, was seen by Dr. Parikh on February 22, 2016. During that session, A.H. and her parents related that A.H. was not satisfied using a gender-neutral bathroom and preferred to use the girl's bathroom. (*Id.* at ¶¶ 136, 137).

A.H. was again seen by Dr. Parikh on May 23, 2016. (*Id.* at ¶ 157).

Dr. Parikh transferred her care of A.H. to Dr. Laurissa Kashmir in a report dated September 19, 2017. (*Id.* at ¶ 159).

A.H. has never missed a significant amount of time from school. Her attendance for any given year has not dropped below 90%. (Doc. 39, ¶ 50). Furthermore, A.H. has performed well academically. (*Id*. at ¶ 51).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating

whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

In this case, the parties have filed cross-motions for summary judgment. According to the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Lawrence v. City of Philadelphia,* 527 F.3d 299, 310 (3d Cir. 2008). Each movant must show that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the Court must deny the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008). When reviewing each cross-motion, the Court is still bound to view the evidence in the light most favorable to the non-movant. Fed. R. Civ. P. 56; *United States v. Hall*, 730 F.Supp. 646, 648 (M.D. Pa. 1990).

## IV. ANALYSIS

Plaintiff and Defendant have filed cross-motions for summary judgment (Docs. 36, 37). Defendant asserts that it is entitled to summary judgment in all respects. In contrast, Plaintiff asserts that she is entitled to summary judgment "on all issues of liability, and on the equitable remedy of a permanent injunction." (Doc. 40, at 3).

Count I of Plaintiff's Amended Complaint asserts that Minersville Area School District violated A.H.'s rights under Title IX by discriminating against her on the basis of sex as follows:

> By adopting and/or enforcing a policy or practice prohibiting A.H., a transgender girl, from accessing and using female-designated restrooms or single-occupancy restrooms, Defendant MASD has discriminated against A.H. in her enjoyment of MASD's educational programs and activities by treating her differently from other female students based on her gender identity, the fact that she is transgender, and her nonconformity with sex stereotypes.

(Doc. 10, ¶ 104).

Similarly, Court II of Plaintiff's Amended Complaint alleges a violation of the Fourteenth Amendment:

> By enforcing a policy and/or practice of prohibiting A.H., a transgender girl, from accessing female designated restrooms at school or at school related functions, and requiring that she use male-designated restrooms or single-occupancy restrooms, Defendant has discriminated against A.H. in her enjoyment of MASD's educational programs and activities by treating her differently than other female students based on her gender identity, the fact that she is transgender, and her nonconformity to female stereotypes, thereby denying her the full participation in, benefits of, and right to be free from discrimination in the educational opportunities offered by MASD, on the basis of sex and transgender status, in violation of the Equal Protection Clause.

(Doc. 10, ¶ 113). As a result, Plaintiff asserts that the District's "policies and/or practices treat transgender students differently than other students who are similarly situated", based on their gender (Doc. 10, ¶ 111; *see also*, *id.* at ¶¶ 132-134).

In the Request for Relief, Plaintiff's Amended Complaint includes a request that the Court "[i]ssue preliminary and permanent injunctions[4] directing" MASD to take a number of actions relating to the treatment of A.H. at school and "at any school function", to clarify its discrimination policies, and to provide additional training for administrators and school board members with respect to their "obligations" under Title IX and the Equal Protection Clause and the application of these laws to the rights of transgender and "gender nonconforming" students. (Doc. 10, at 23-24).

---

[4] Plaintiff never moved for a preliminary injunction in this action.

Defendant asserts that "Plaintiff has failed to produce sufficient evidence to sustain a claim of sex discrimination in violation of Title IX . . . so that the District is entitled to judgment as a matter of law as to those claims [Count I]" and that "Plaintiff has failed to produce sufficient evidence to sustain a claim for violation of A.H.'s Equal Protection rights (Count II), such that the District is entitled to judgment as a matter of law."  (Doc. 37, ¶¶ 8, 9).

In turn, Plaintiff asserts that she is entitled to summary judgment on both Counts as to the issue of liability because the District is in violation of Title IX as it "has failed to offer any legitimate reason other than sex" for its "policies" regarding A.H.'s bathroom use and that Defendant's "policies" deny A.H. equal protection as it treats her differently from the rest of the school students.  (Doc. 40, at 18, 23).

## A.  Count I – Title IX

Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Although the only enforcement mechanism explicitly provided for in Title IX is administrative, *see* 20 U.S.C. § 1682, the Supreme Court has "recognized an implied private right of action under Title IX," and has "held that money damages are available in such suits," *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).  "Title IX has no administrative exhaustion requirement and no notice provisions.  Under its

implied private right of action, plaintiffs can file directly in court, and can obtain the full range of remedies." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) (internal citations omitted). Specifically, a private damages action under Title IX is not barred "where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis*, 526 U.S. at 642 (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)).

"To establish a prima facie case of discrimination under Title IX, a plaintiff must allege (1) that he or she was subjected to discrimination in an educational program, (2) that the program receives federal assistance, and (3) that the discrimination was on the basis of sex." *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 295 (W.D. Pa. 2017); *Johnson v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F.Supp.3d 657, 674 (W.D.Pa. 2015); *see also Bougher v. Univ. of Pittsburgh*, 713 F.Supp. 139, 143-144 (W.D. Pa. 1989). To obtain damages as a result of the discrimination, a plaintiff must further establish that the discrimination was intentional. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (Since 1979, Supreme Court opinions "have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of *intentional* sex discrimination")(emphasis added); *Davis*, 526 U.S. at 642-643 (an intentional violation of Title IX is capable of supporting a private damages action); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 74-75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (limitations on private damages actions is not a bar to liability under

Title IX where a funding recipient intentionally violates that statute).  *See also*, *Williams v. Pennridge Sch. Dist.*, -- F.App'x --, 2019 WL 3430275 (3d Cir. 2019) ("The hallmark of [Title VI, Title IX, the Equal Protection Clause, and PHRA] claims is intentional discrimination").

In addition, Title IX "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 640.[5]  Damages in a Title IX action thus cannot be recovered where liability rests solely on principles of vicarious liability or constructive notice.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Rather, "a central purpose of requiring notice of the [Title IX] violation 'to the appropriate person' and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures."  *Id*. at 289.  "It would be unsound . . . for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into

---

[5] As the Supreme Court further explained with respect to a funding recipient's "adequate notice":

When Congress acts pursuant to its spending power, it generates legislation "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In interpreting language in spending legislation, we thus "insis[t] that Congress speak with a clear voice," recognizing that "[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it." *Ibid.; see also id.,* at 24-25, 101 S.Ct. 1531.

*Davis*, 526 U.S. at 640.

voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* (emphasis in original).

As applicable to the present action before this Court, although "Title IX prohibits discrimination based on sex in all educational programs that receive funds from the federal government[,] . . . discrimination with regard to privacy facilities is exempt from that blanket prohibition." *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018). Instead, "[a]n institution 'may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.' This exception is permissive – Title IX does not require that an institution provide separate privacy facilities for the sexes." *Id.* (quoting 34 C.F.R. § 106.33). Nonetheless, "the use by students of school restrooms is part and parcel of the provision of educational services covered by Title IX." *Evancho*, 237 F.Supp.3d at 295.

### A.1 – Defendant's Motion for Summary Judgment on Plaintiff's Title IX Claim

Here, it is beyond dispute that MASD receives federal assistance, and therefore to satisfy her *prima facie* burden, plaintiff must only establish on summary judgment that she was subjected to discrimination in an educational program and that the discrimination was on the basis of sex.

In support of its motion for summary judgment on Plaintiff's Title IX claim, MASD first argues that "the state of the law regarding the applicability of Title IX to transgender students' use of restroom facilities remains in flux." (Doc. 38, at 5). Although not explicitly stated, such argument appears to address the requirement that "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue", *Davis*, 526 U.S. at 640. Defendant further argues that, even assuming Title IX applies to the present action, the plaintiff "has failed to demonstrate that she was discriminated against by the District" (Doc. 38, at 8). Specifically, the District asserts that Plaintiff has failed to set forth any evidence that the District intentionally discriminated against A.H. (*Id*.). Because an evaluation of these arguments is significantly intertwined, the Court will address them together.

On January 7, 2015, the Acting Deputy Assistant Secretary for Policy at the Department of Education issued a letter ("2015 Guidance"), and the Department of Education and Department of Justice subsequently issued a joint letter on May 13, 2016 ("2016 Guidance"). In particular, the May 13, 2016, letter "summarize[d] a school's Title IX obligations regarding transgender students and explain[ed] how the U.S. Department of Education (ED) and the U.S. Department of Justice (DOJ) evaluate[s] a school's compliance with these obligations." *See Dear Colleague Letter*, U.S. DEP'T OF JUSTICE & U.S. DEP'T OF EDUC., (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf ("2016 Guidance"). The 2016 Guidance specified that Title IX's

prohibition on sex discrimination in educational programs and activities "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status," and that, under Title IX and 34 C.F.R. § 106.33, "[a] school may provide separate [restroom and locker room] facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity." *Id.*

On February 22, 2017, citing to "significant litigation regarding school restrooms and locker rooms" as a result of the 2015 and 2016 Guidance, the Department of Education and the Department of Justice issued another letter "withdrawing the statements of policy and guidance reflected in" the 2015 and 2016 Guidance "in order to further and more completely consider the legal issues involved." *See Dear Colleague Letter*, U.S. DEP'T OF JUSTICE & U.S. DEP'T OF EDUC., (February 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf ("2017 Guidance"). However, the letter cautioned that "this withdrawal of these guidance documents does not leave students without protections from discrimination, bullying, or harassment. All schools must ensure that all students, including LGBT students, are able to learn and thrive in a safe environment." *Id.*

In addition to the aforementioned Department of Education and Department of Justice Guidance, the last four years have yielded an influx of cases and Court decisions involving the rights of transgender students to use the restroom corresponding to their gender identity rather than the sex which he/she was assigned at birth.

In *Doe by & through Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018), the Third Circuit found that, under the specific circumstances presented therein, "the presence of transgender students in the locker and restrooms is no more offensive to constitutional or Pennsylvania-law privacy interests than the presence of the other students who are not transgender." *Id.* at 521. It thus affirmed the District Court's refusal to enjoin the Defendant School District from allowing transgender students to use bathrooms and locker rooms consistent with their gender identities rather than their determined sex at birth.

In *Boyertown*, high school students sued their School District after it changed its bathroom and locker room policy to permit transgender students to use bathrooms and locker rooms that were consistent with the students' gender identities. *Id.* at 521-522. In initiating this policy, the School District "adopted a very careful process that included student-specific analysis [and p]ermission was granted on a case-by-case basis." *Id.* at 524. Plaintiffs asserted that the policy violated their constitutional rights of bodily privacy, as well as Title IX and Pennsylvania tort law, and moved for a preliminary injunction. In evaluating the plaintiffs' Title IX claim, the Circuit agreed with the District Court that Plaintiffs were unlikely to succeed on the merits of such claim. As the Third Circuit explained:

> The District Court rejected the appellants' Title IX claim because the School District's policy treated all students equally and therefore did not discriminate on the basis of sex, and because the appellants had failed to meet the elements of a "hostile environment harassment" claim. We . . . agree. We also agree with the School District's position that barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation.

*Boyertown*, 897 F.3d at 533. In affirming the District Court's findings, the Circuit recognized the instructive nature of Title VII cases in forming the proper analysis and noted that "Courts have frequently looked to Title VII authority for guidance with Title IX cases", including the law governing Title VII claims of discrimination on the basis of sex. *Id.* at 534 & n. 103. Thus, as in a Title VII action where a plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex", the "same requirement holds true for Title IX claims." *Id.* at 534.

One year prior to the Third Circuit's decision in *Boyertown*, the Seventh Circuit decided an action addressing similar issues. In *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, a school's unwritten policy prevented a seventeen-year-old transgender boy, Ash, from using the boy's bathroom. 858 F.3d 1034, 1038-1039 (7th Cir. 2017). After the District Court denied the school district's motion to dismiss and granted Ash's motion for a preliminary injunction which allowed him to use the boy's bathroom, the School District appealed. *Id.* at 1039. In deciding whether to uphold the preliminary injunction, the Seventh Circuit evaluated Ash's likelihood of success on his claim that the school's bathroom policy violated Title IX. *Id.* at 1046. Observing that courts have "looked to Title VII when construing Title IX," the panel examined *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), where "a plurality of the Supreme Court and two justices concurring in the judgment, found that the plaintiff had adequately alleged that her employer, in violation of Title VII, had discriminated against her

for being too masculine." *Whitaker*, 858 F.3d at 1047. The Circuit then noted that "[f]ollowing *Price Waterhouse*, this court and others have recognized a cause of action under Title VII when an adverse action is taken because of an employee's failure to conform to sex stereotypes." *Id*. at 1048. Relying on this line of cases, the Court held that Ash could proceed with his Title IX sex discrimination claim under a theory of sex-stereotyping:[6]

> Ash can demonstrate a likelihood of success on the merits of his claim because he has alleged that the School District has denied him access to the boys' restroom because he is transgender. A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX. The School District's policy also subjects Ash, as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX. Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act.

*Id*. at 1049-1050.

In addition to the decisions of the Third Circuit and Seventh Circuit, a number of District Courts across the United States have addressed the rights of transgender students to use the restroom corresponding to his/her gender identity in relation to Title IX and Equal Protection Clause claims.

---

[6] It must be noted that although the Third Circuit cited approvingly to *Whitaker* in *Boyertown*, the Circuit declined to extend its holding as broadly as the Court did in *Whitaker*. *See Boyertown*, 897 F.3d at 536 ("The School District. . . contends that barring transgender students from using privacy facilities that align with their gender identity would, itself, constitute discrimination under a sex-stereotyping theory in violation of Title IX. We need not decide that very different issue here.").

For example, in *Evancho v. Pine-Richland School District*, 237 F.Supp.3d 267 (W.D. Pa. 2017), three transgender high school students sought a preliminary injunction that would enjoin their school from enforcing a policy promulgated by the School Board which required the students to use either a single-user bathroom or the bathroom that corresponded with the sex that the students were assigned at birth. *Id.* at 272-273. The Court denied the students' motion for a preliminary injunction on the basis of the Title IX claim,[7] holding that

> the law surrounding [34 C.F.R. § 106.33] and its interpretation and application to Title IX claims relative to the use of common restrooms by transgender students, including the impact of the 2017 Guidance, is at this moment so clouded with uncertainty that this Court is not in a position to conclude which party in this case has the likelihood of success on the merits of that statutory claim.

*Id.* at 301. Nevertheless, the Court denied the school district's motion to dismiss the students' Title IX claim, holding that the students "made a more than sufficient 'showing' in their Complaint of a right to relief under . . . Title IX." *Id.* at 283 n.23. Citing a number of cases that have embraced a broad reading of the term "sex" as used in Title VII and Title IX, the Court concluded that the students "demonstrated a reasonable likelihood of showing that Title IX's prohibition of sex discrimination includes discrimination as to transgender individuals based on their transgender status and gender identity." *Id.* at 296-297. The Court clarified that the fact that it did "not at this juncture conclude that the Plaintiffs have a

---

[7] The *Evancho* Court did, however, grant the students' motion for a preliminary injunction pursuant to their claim that the school's policy violated the Fourteenth Amendment. *Evancho*, 237 F.Supp.3d at 295.

likelihood of success on the merits of their Title IX claim for preliminary injunction purposes

means only that they have not passed over the bar for the entry of that extraordinary

equitable remedy." *Id*. at 283 n.23.

The *Evancho* Court was also careful to note that:

> The parties agree that for all purposes other than restroom use, the District treats each of the Plaintiffs consistently with their stated and experienced gender identity, and it appears to the Court that it seeks to do so with appropriate sensitivity to their needs and interests and the needs and interests of all students. . . . The District also vigorously stated at oral argument that it is not its intention, in any way, shape or form, to label the Plaintiffs as having a sex designation other than their stated gender identities, with the single exception being the one at the core of this lawsuit: the use of common restrooms.

*Id*. at 281-282. *See also*, *id.* at 302 ("From all accounts, the District's professional educators

have worked hard to treat all students, including the Plaintiffs, with respect and to provide all

students with an excellent education in an inclusive environment. In doing so, they have

sought to comply with the law as their own oaths require while fulfilling the directives of the

School Board as embodied in Resolution 2.").

Similarly, in *M.A.B. v. Board of Education of Talbot County*, 286 F.Supp.3d 704 (D.

Md. 2018), a transgender male brought an action against the school board, school

superintendent, and school principal alleging violations of Title IX, the Equal Protection

Clause, and state law, as a result of the Defendants' decision[8] to prohibit him from using the

---

[8] Although the Court referred to the School's decision to prohibit M.A.B. from using the boy's locker room as a "policy", it noted that "the Board simply made a decision and communicated it to M.A.B.'s counsel" and that the "High School principal at the time later advised M.A.B. and his parents of this

boys' locker rooms at school.[9]  The District Court denied Defendants' motion to dismiss as well as Plaintiff's motion for preliminary injunction.  In so doing, the Court explained that "transgender discrimination is per se actionable sex discrimination under Title VII based on *Price Waterhouse*", in accord with prior First, Sixth, Ninth, and Eleventh Circuit decisions. *Id*. at 714-715 (collecting cases).  "More generally, the First, Second, Third, Seventh, and Ninth Circuits have all recognized that an allegation of gender stereotyping is actionable sex discrimination under Title VII based on *Price Waterhouse*."  *Id*. (collecting cases).  The Court therefore concluded that "on the basis of the Supreme Court's holding in *Price Waterhouse*, subsequent opinions of several Courts of Appeals, and this Court's opinion in [*Finkle v. Howard Cty*., 12 F.Supp.3d 780 (D.Md. 2014)], . . . allegations of gender stereotyping are cognizable as sex-discrimination claims under Title VII, and consequently, Title IX.  The Court further concludes, on the basis of *Finkle* and several Courts of Appeals decisions, that claims of discrimination on the basis of transgender status are per se actionable under a gender stereotyping theory."  *Id*. at 715.  Applying this law, the *M.A.B.* Court found that the School's "policy" punished M.A.B. for his "gender non-conformance, which in turn violates Title IX" and that "Defendants' decision to bar M.A.B. from the boys'

---

decision."  *M.A.B.*, 286 F.Supp.3d at 709 n. 4.  It thus does not appear that there was any written policy in place at the time of the events at issue.

[9] The School initially also prohibited M.A.B. from using the boys' restroom, but later allowed him to do so following the Fourth Circuit's decision in *G.G. ex rel. Grimm v. Gloucester County School Board* in 2016.  *M.A.B.*, 286 F.Supp.3d at 709.

locker room subjects him, as a transgender student, to different rules, sanctions, and treatment than non-transgender students." *Id.* at 717 (internal quotation marks omitted).

*G.G. ex rel. Grimm v. Gloucester County School Board* is one of only a small number of cases addressing transgender students' rights to use the bathroom corresponding to their gender identity that has been fully adjudicated, from the filing of motions to dismiss and for preliminary injunction through the grant of a motion for summary judgment, in a District Court. The extensive history of this action began in 2015, when a transgender male student, G.G., challenged a resolution passed by the Gloucester County School Board limiting use of the school restrooms and locker rooms "to the [students'] corresponding biological genders" and providing "students with gender identity issues . . . an alternative appropriate private facility." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd*, 132 F.Supp.3d. 736 (E.D. Va. 2015) (hereinafter "*Grimm I*"). G.G. challenged the School Board's restroom policy under the Equal Protection Clause and Title IX and filed a Motion for Preliminary Injunction, requesting that the Court issue an injunction allowing G.G. to use the boys' bathroom at Gloucester High School. The School Board opposed the Motion for Preliminary Injunction and filed a Motion to Dismiss. At a hearing on the motions, the Court granted Defendant's motion with respect to Plaintiff's Title IX claim and thereafter denied the motion for preliminary injunction.

On interlocutory appeal, the Fourth Circuit reversed the dismissal of the Title IX claim on the basis that the District Court did not accord appropriate deference to the relevant

Department of Education regulations and in particular the Guidance Letter issued by the Department of Education's Office of Civil Rights that interpreted a Title IX regulation as generally requiring a school to treat transgender students consistent with their gender identity when separating students on the basis of sex. The Circuit Court further vacated the District Court's denial of the motion for preliminary injunction because the District Court used the wrong evidentiary standard in assessing that motion. *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd*, 822 F.3d 709 (4th Cir. 2016) (hereinafter "*Grimm II*").

In 2017, the Supreme Court vacated the Fourth Circuit's decision and remanded the case to the Circuit Court "for further consideration in light of the guidance document issued by the Department of Education and Department of Justice on February 22, 2017." *Gloucester Cty. Sch. Bd v. G.G. ex rel. Grimm*, 137 U.S. 1239 (2017) (Mem.).

In August 2017, Plaintiff filed an Amended Complaint in the District of Virginia, again alleging claims under Title IX and the Equal Protection Clause. In 2018, the District Court denied Defendant's Amended Motion to Dismiss. Although the Court acknowledged that "[n]either the Fourth Circuit nor the Supreme Court has addressed how Title VII applies to transgender individuals", citing *Price Waterhouse*, the Court explained that the Supreme Court has "recognized that Title VII's prohibition on sex discrimination necessarily includes a prohibition on gender stereotyping." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd*, 302 F.Supp.3d 730, 744 (E.D. Va. 2018) (hereinafter "*Grimm III*"). The Court further recognized that "[t]he First, Second, Third, Seventh, and Ninth Circuits have all recognized that based

on the logic of *Price Waterhouse*, a gender stereotyping allegation generally is actionable sex discrimination under Title VII." *Id*. at 745 (collecting cases). The Court therefore:

> Join[ed] the District of Maryland in concluding that "discrimination on the basis of transgender status constitutes gender stereotyping because 'by definition, transgender persons do not conform to gender stereotypes.'" *M.A.B.*, 286 F.Supp.3d at 714 (quoting *Finkle v. Howard Cty.*, 12 F.Supp.3d 780, 787-88 (D. Md. 2014)). The Court also concludes that, pursuant to the logic of *Price Waterhouse*, transgender discrimination is per se actionable sex discrimination under Title VII. *Id.; see also G.G. ex rel. Grimm* (*Grimm II* ), 654 Fed.Appx. 606, 606-07 (4th Cir. 2016) (Davis, J., concurring) (internal citations omitted) (noting that "the Supreme Court has expressly recognized that claims based on an individual's failure to conform to societal expectations based on that person's gender constitute discrimination 'because of sex' under Title VII," and noting that the First, Sixth, Ninth, and Eleventh Circuits have held that based on the logic of *Price Waterhouse*, discrimination against transgender individuals based on their transgender status is discrimination because of sex under federal civil rights statutes and the Equal Protection Clause).

*Id*. at 746. The District Court further held that "allegations of gender stereotyping are cognizable Title VII sex discrimination claims and, by extension, cognizable Title IX sex discrimination claims" and "join[ed] the District of Maryland and several other appellate courts in concluding that 'claims of discrimination on the basis of transgender status are per se actionable under a gender stereotyping theory' under Title IX." *Id*. at 746-747 (quoting *M.A.B.*, 286 F.Supp.3d at 715). In setting forth its rationale, the Court explained that "[t]his conclusion comports with decisions from the First, Sixth, Ninth, and Eleventh Circuits, all of which recognize that based on the gender-stereotyping theory from *Price Waterhouse*, claims of discrimination on the basis of transgender status are per se sex discrimination under Title VII or other federal civil rights laws" and noted that "[n]umerous district courts

have also concluded that a transgender individual can state a claim under Title VII for sex discrimination on the basis of a sex or gender-stereotyping theory." *Id*. at 746.

In denying the defendant's motion to dismiss, the District Court dismissed the School Board's argument that Title IX must explicitly refer to discrimination against transgender students to fulfill the notice requirements set forth by the Supreme Court in *Pennhurst*. The Court found this argument unavailing as "Title IX funding recipients 'have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979,' when the Supreme Court decided *Cannon v. University of Chicago*, 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and 'have been put on notice by the fact that . . . cases since *Cannon* . . . have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination.' *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005); *see also West Virginia Dep't of Health & Human Resources v. Sebelius*, 649 F.3d 217, 223 (4th Cir. 2011)." *Grimm III*, 302 F.Supp.3d at 746 n.11.

For these reasons, relying principally on *Whitaker* and *M.A.B.*, the Court held that Plaintiff had stated a valid claim under Title IX by alleging that the policy improperly discriminated against him on the basis of sex (his transgender status) and that the discrimination harmed him.

In August, 2019, the District Court in *Grimm* granted Plaintiff's motion for summary judgment and denied Defendant's cross-motion for summary judgment. *Grimm v.*

*Gloucester Cty. Sch. Bd*, -- F.Supp.3d --, 2019 WL 3774118 (E.D. Va. 2019) (hereinafter

"*Grimm IV*").  On summary judgment, the School Board argued that the District Court erred

on the motion to dismiss when concluding that claims of discrimination on the basis of

transgender status are *per se* actionable under a gender stereotyping theory.  In response

to the Board's argument that "'the plain language of Title IX and its implementing regulation,

34 C.F.R. § 106.33,' define sex as a binary term encompassing the physiological

distinctions between men and women", the Court stated:

> The Board presents no intervening case law that compels reconsideration of
> this decision. To the contrary, every court to consider the issue since May 22,
> 2018 has agreed with the analysis relied upon by this Court. *See Doe by &
> through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018)
> (stating that a policy forcing transgender students to use separate facilities
> "would very publicly brand all transgender students with a scarlet 'T,' and they
> should not have to endure that as the price of attending their public school");
> *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*, 318 F.Supp.3d 1293,
> 1325 (M.D. Fla. 2018) (holding that "the meaning of 'sex' in Title IX includes
> 'gender identity' for purposes of its application to transgender students" and
> that the transgender student proved a Title IX violation where a school board
> denied him from using male restrooms, causing him harm) *appeal docketed*,
> No. 18-13592 (11th Cir. Aug. 24, 2018); *Parents for Privacy v. Dallas Sch. Dist.
> No. 2*, 326 F.Supp.3d 1075, 1106 (D. Or. 2018) ("Forcing transgender students
> to use facilities inconsistent with their gender identity would undoubtedly harm
> those students and prevent them from equally accessing educational
> opportunities and resources. Such a. . . District policy would punish
> transgender students for their gender noncomformity and constitute a form of
> sex-stereotyping.") *appeal docketed*, 18-35708 (9th Cir. Aug. 23, 2018).

*Id*. at *8-9.  The Court concluded that "there is no question that the Board's policy

discriminates against transgender students on the basis of their gender noncomformity.

Under the policy, all students except for transgender students may use restrooms

corresponding with their gender identity. Transgender students are singled out, subjected to discriminatory treatment, and excluded from spaces where similarly situated students are permitted to go." *Id*. at *9. After engaging in an analysis of the record evidence, the Court further determined that the improper discrimination caused Plaintiff harm. *Id*. at *9-11. For these reasons, the Court held that the Board violated Title IX. The Court further granted summary judgment in favor of Plaintiff on his Equal Protection claims.

In *Adams by & through Kasper v. School Board of St. Johns County*, 318 F.Supp.3d 1293 (M.D. Fla. 2018), another Title IX transgender case that has been fully adjudicated by a District Court, a transgender male brought an action against the School Board alleging that his rights under Title IX and the Equal Protection clause were violated by the School District's refusal to allow him to use the boys' bathroom at school. There, the School District had a policy that required students to use the restroom corresponding to his/her sex assigned at birth, as reflected on the student's enrollment documents, or a gender-neutral single stall restroom. Following a bench trial, the Court found that the School Board's bathroom policy violated Plaintiff's rights under Title IX and the Equal Protection Clause. The Court in *Adams* first recognized that there is an open question of whether the term "sex" in Title IX is limited to "biological sex" or can be expanded to include gender identity. *Id*. at 1321. Specifically, "[g]iven the lack of definition within the statute or regulation, and recognizing that a number of courts have struggled with this exact question, this Court finds the term 'sex' as used in Title IX is ambiguous as applied to transgender students." *Id*. The

Court thus, following the direction of other Courts, looked to *Price Waterhouse* and Title VII case law "to conclude that the meaning of 'sex' in Title IX includes 'gender identity' for purposes of its application to transgender students." *Id*. at 1324-1325. As a result, the Court found a violation of Title IX "because the School Board, a federally funded institution, prohibits Adams, a transgender boy, from using the boys' restroom 'on the basis of sex,' which discrimination caused him harm." *Id*. at 1325.

Finally, in a case factually similar to *Boyertown*, the District Court held in *Parents for Privacy v. Dallas School District No. 2*, 326 F.Supp.3d 1075 (D. Ore. 2018), in relevant part, that a high school's policy of allowing transgender students to use restrooms, locker rooms, and showers that matched their gender identity rather than their biological sex did not discriminate on the basis of sex within the meaning of Title IX. In so holding, the Court explained that the request of Plaintiffs, current and former students and their parents, that the School District be enjoined from enforcing the policy "would itself violate Title IX":

> A court order directing [the] District to require students to use only facilities that match their biological sex or to use gender-neutral alternative facilities would violate Title IX. Forcing transgender students to use facilities inconsistent with their gender identity would undoubtedly harm those students and prevent them from equally accessing educational opportunities and resources. Such an injunction or District policy would punish transgender students for their gender nonconformity and constitute a form of sex-stereotyping.

*Id*. at 1106.

In the present action, Minersville Area School District recognizes that this Court, in previously denying the District's motion to dismiss, "found that Title IX is applicable to

transgender individuals." (Doc. 38, at 6). Defendant does not explicitly argue that this finding is incorrect or should be revisited, but instead urges this Court to recognize that the law under Title IX with respect to transgender students' use of the restroom facilities of their choice is unsettled and therefore find that the District cannot be held liable under Title IX. *See* Doc. 38, at 8 ("Given the uncertainty of whether Title IX actually protects the rights of transgender students concerning their use of restroom facilities, and in the absence of any 'formal' guidance from the federal government, state government, or PSBA, school districts in Pennsylvania are, at best, left with the advice of PBSA 'to work with transgender students and to accommodate them as they are able.'").[10]

MASD raised a similar argument in its motion to dismiss Plaintiff's Amended Complaint, *i.e.* that in light of the 2017 Guidance, Plaintiff could not maintain a Title IX claim due to the unsettled nature of the law and a lack of any "legal basis to support a Title IX claim" for transgender discrimination. (Doc. 12, at 5-8). As this Court previously explained:

> The 2017 Guidance . . . "did not propound any 'new' or different interpretation of Title IX or [34 C.F.R. § 106.33], nor did the 2017 Guidance affirmatively contradict the 2015 and 2016 Guidance documents." *Evancho*, 237 F.Supp.3d

_____

[10] Defendant further asserts that this Court's finding that Title IX is applicable to transgender individuals "relied in part upon the analysis employed in both *Evancho* and *Whitaker*. . . ." (Doc. 38, at 6). Defendant implies this reliance was erroneous because, according to Defendant, "both *Evancho* and *Whitaker* involved actual written restroom policies that impacted transgender students, which is in stark contrast to the instant action." (*Id.*). Defendant's assertion that *Evancho* and *Whitaker* are inapposite in this regard blatantly misrepresents the facts of *Whitaker* and ignores other case law wherein Courts have found unwritten policies regarding transgender students sufficient to find that Title IX imposed liability on the School District. *See Whitaker*, 858 F.3d at 1039 n.2 ("We will refer to the School District's decision to deny Ash access to the boys' restroom as a 'policy,' although any such 'policy' is unwritten and its exact boundaries are unclear"); *M.A.B.*, 286 F.Supp.3d at 709 n. 4 (terming a school's decision to prohibit M.A.B. from using the boy's locker room, which was only communicated to M.A.B.'s counsel, M.A.B., and his parents, as a "policy").

at 298. Instead, the 2017 Guidance "appears to have generated an interpretive vacuum pending further consideration by those federal agencies of the legal issues involved in such matters." *Id.* Thus, the fact that the Department of Justice and the Department of Education withdrew their interpretation of Title IX does not necessarily mean that a school, consistent with Title IX, may prohibit transgender students from accessing the bathrooms that are consistent with their gender identity. Instead, it simply means that the 2016 Guidance cannot form the basis of a Title IX claim.

(Doc. 21, at 9). *See also*, *Parents for Privacy*, 326 F.Supp.3d at 1086 ("The February 2017 Dear Colleague Letter did not state that the prior guidance was unlawful, nor did the [Department of Education and Department of Justice] replace the prior guidance with new guidance."). Furthermore, "cases examining the [issue of whether "sex" under Title IX includes gender identity] subsequent to that [2017] withdrawal [of the 2016 Guidance] have found a likelihood (or permitted cases to proceed on a claim) that a policy that prohibits transgender students from using a bathroom matching their gender identity have separated students 'on the basis of sex' within the meaning of Title IX." *Adams*, 318 F.Supp.3d at 1323 (citing *Whitaker*, 858 F.3d at 1049-50; *Grimm III*, 302 F.Supp.3d at 742-748; *Evancho*, 237 F.Supp.3d at 283 n.23; *A.H.*, 290 F.Supp.3d 321, 329 (M.D. Pa. 2017)).

Nonetheless, the Third Circuit has not definitively found that barring a transgender student from a restroom which aligns with his/her gender identity, by itself, constitutes a Title IX violation. Rather, the Circuit has explained that "barring transgender students from restrooms that align with their gender identity would itself pose a *potential* Title IX violation." *Boyertown*, 897 F.3d at 533 (italics added). However, the facts in *Boyertown* did not present the Third Circuit with the opportunity to address the issue now before this Court

where, in *Boyertown*, the challenged School District policy provided for the inclusion, rather than exclusion, of transgender students from restrooms and locker rooms consistent with their gender identity. *See id.* at 536 ("The School District. . . contends that barring transgender students from using privacy facilities that align with their gender identity would, itself, constitute discrimination under a sex-stereotyping theory in violation of Title IX. We need not decide that very different issue here.").

While a number of the above-discussed cases were decided in 2017 and 2018, many arise from violations that pre-dated the 2016 Guidance. Thus, the District's assertion that it cannot be liable under Title IX because, at least prior to 2016, the law with respect to Title IX and transgender students was undecided, is without support. Moreover, as explained by the Court in *Grimm III*, "Title IX funding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when the Supreme Court decided *Cannon* . . . , and have been put on notice by the fact that . . . cases since *Cannon* . . . have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Grimm III*, 302 F.Supp.3d at 746 n.11 (internal citations and quotation marks omitted); *see also*, *Grimm IV*, 2019 WL 3774118, at *13 n.12 ("Much of the Board's Summary Judgment Motion is an attempt to relitigate this Court's prior holdings. For example, the Board argues that if 'sex' were equated with 'gender identity,' Title IX and its regulations would be invalid for lack of clear notice. . . This Court found this exact argument 'unavailing.'")(internal citations omitted).

However, the present case differs from every other legal action addressing a transgender student's rights to use the restroom corresponding to his/her gender identity while at school in a significant respect: since prior to the commencement of the lawsuit, the transgender student at issue has not been denied the right to use the restroom of her choice while on the school premises. Thus, this case presents an unusual factual situation wherein A.H. is currently allowed to use the girls' bathroom at school and has been able to do so since 2016. Although the School District thus far has refused to implement a written policy guaranteeing A.H., or any other transgender student, the right to continue using the bathroom that corresponds to his/her gender identity, the District has not stated, or performed any actions, to indicate that it will not allow A.H. to continue using the girls' bathroom. Rather, A.H. has only been told by the School District that she may not use the women's restrooms on school field trips, outside of the school premises, an issue not raised in any other action involving transgender students' rights to use the restroom of their choice.

As a result, A.H.'s claims under Title IX are premised on a very narrow set of facts. The parties fail to specifically define the extent of the District's purported liability, and specifically for what actions or inactions the District can be held liable under Title IX. However, upon review of the record, it appears that the alleged discrimination and discriminatory acts at issue in this case are as follows: (1) the decision that A.H. would use the unisex bathroom when she commenced first grade; (2) the decision that A.H. must use the men's bathroom, or a family/unisex bathroom, on the zoo field trip while she was in

kindergarten; and (3) the decision that A.H. must use the unisex/family bathroom on the zoo field trip while she was in first grade, in the absence of a parent accompanying her.

As previously set forth, Defendant's motion for summary judgment asserts that even assuming Title IX applies to the present action, the plaintiff "has failed to demonstrate that she was discriminated against by the District" and specifically, that Plaintiff has failed to establish the requisite discriminatory intent. (Doc. 38, at 8). As this Court noted in its Opinion denying Defendant's motion to dismiss, "a specific practice need not be identified as unlawful by the government before a plaintiff may bring a claim under Title IX." (Doc. 21, at 13). In addition, despite Defendant's assertion that Plaintiff has failed to set forth evidence establishing that any discrimination was intentional, Defendant ignores that despite the number of accommodations it made on behalf of A.H., this does not prevent a finding of intentionality in relation to any other decisions it may have made based solely on the basis of A.H.'s sex which were discriminatory.

With respect to the issue of A.H.'s use of restrooms on field trips, MASD made a unilateral decision mandating that A.H. would not be permitted to use the women's restrooms on school-sponsored field-trips. There can be no dispute that this decision by the District was made after deliberations by McBreen and Yacobacci,[11] and was deliberate and

---

[11] McBreen, as superintendent of MASD, is an appropriate person under Title IX for the imposition of liability on the District. It is undisputed that McBreen was aware that A.H. was transgender at all relevant times, and he testified that he was the person who decided that A.H. could not use the women's restroom on the field trips and made the policy decisions as to A.H.'s use of the restrooms at school and on off-campus school trips. (*See e.g.,* Dep. of McBreen, at 47, 49-50, 52-53, 61-65, 67-72). Furthermore, Yacobacci, as elementary school principal, arguably may also be considered an appropriate person under

intentional. Furthermore, it is undisputed that the decision was made by the District without consulting with, or originally notifying, A.H.'s parents. This policy appears to have shifted prior to the second field-trip, where after A.H.'s parents were made aware of the District's policy following the first field-trip and objected, Tracey Handling was told she would have to accompany A.H. on a field trip if she wanted her daughter to use the women's bathroom. This, however, does not alter the undisputed facts of record which demonstrate a unilateral decision by the District to treat A.H. differently from all other students in her class by preventing her from using the women's bathrooms at school-sponsored events. (*See e.g.*, Dep. of Yacobacci, at 77-78 (stating that on field trips, "[t]he only guidance was that A.H. would go into the bathroom privately for herself", but that there was no "guidance" with respect to any other student's use of an off-campus public restroom)). This policy further forced a parent or guardian to accompany A.H. on any field-trips in order to ensure A.H. was allowed to use the bathroom corresponding to her gender identity, a requirement to which no other student was subject.

In addition, although the District repeatedly argues that it has no control over the restrooms off-school premises and therefore cannot be held liable (*see e.g.*, Doc. 38, at 10-11, 13; Dep. of McBreen, at 49, 57), there is no evidence of record that McBreen, Yacobacci, or any other staff member or representative of MASD contacted the Lehigh

---

Title IX. *See Warren ex rel. Good v. Reading Sch. Dist,* 278 F.3d 163, 171 (3d Cir. 2002) (a school principal "who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an appropriate person' under Title IX" for purposes of the imposition of liability.).

Valley Zoo or Hershey Zoo to inquire whether that facility had any policies with respect to the use of its restrooms while at that property. The District thus unilaterally decided that, despite its current contention that it does not control off-site facilities, A.H. would nonetheless be unable to use the facility of her choice. In addition, this policy appears to currently extend not only to the past two field trips to the zoos, but also to any other student field trips that may arise in the future. The off-school premises, specifically here, the zoos, played *no* role in the decision that A.H. would not be allowed to use the women's restroom on their premises during the school's field trips, nor has Defendant set forth any evidence creating a dispute of fact that either zoo, or any other location the students may visit on a school-sponsored field trip, had a policy preventing transgender individuals from using the restroom corresponding to their gender identity.[12] It was MASD, not any outside or private business, that created and implemented a policy which prohibited A.H. from using the bathroom of her preference on the school fields. This presents unequivocal evidence of discriminatory intent on the part of Defendant.

Nor has MASD set forth any case law for their assertion that, because it "had no control over the public bathrooms" (Doc. 38, at 10), it should not be held responsible for the policy that it unilaterally created and imposed restricting a student's ability to use the

---

[12] In fact, it is undisputed that A.H.'s mother accompanied A.H. to the women's restroom on the second field trip without incident. The fact that Tracey Handling *had* to attend the field trip in order to ensure A.H. could use the women's restroom, when no other student's parent/guardian is required to do the same, is further evidence of discriminatory intent and treatment.

restroom of her choice off-campus. MASD's argument is internally inconsistent. If it truly had no control over the public bathrooms off-campus, then it would be equally true that it could not dictate which restroom a student could use. (*See e.g.*, Dep. of McBreen, at 56-57 (stating that one concern he had about A.H. using a girls' bathroom on a field trip was that it was a "school sponsored event at a public facility[, a]nd she was part of our group."). The fact that the school determined that it had the ability to tell A.H. what restroom she could use, or not use, indicates that it was exercising control over the student and her actions. In that respect, a school can be held liable for actions, or lack thereof, which cause a student harm or discriminate against that student off-campus, if the off-campus event is under the substantial control of the school and the students are subject to the school's disciplinary authority. *Cf. Davis*, 526 U.S. at 646-647.[13] *See Whitaker*, 858 F.3d at 1040 (transgender-student repeatedly requested that he be allowed "to use the boys' restroom while at school *and at school-sponsored events*.")(emphasis added); *see also*, *id*. at 1042 ("Although not part of this appeal, Ash contends that he has also been subjected to other negative actions

---

[13] Although in *Davis*, the misconduct at issue involved student-on-student harassment and occurred "during school hours and on school grounds", the Supreme Court explained that a school may be liable under Title IX where "the recipient retains substantial control over the context in which the harassment occurs" and that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646-647.

by the School District, including . . . requiring him to room with female students or alone on school-sponsored trips.").[14]

The District has set forth material facts, and arguments in its brief in support of its motion for summary judgment, to demonstrate that A.H. enjoyed the first field trip, that there was "absolutely no issue with the restroom", that she was "unaffected by any of the alleged events regarding the field trip", and that there is no evidence "that any students were even aware of the restroom situation."  (Doc. 38, at 11-12; Doc. 39, ¶¶ 29, 30).  However, not only are these assertions in dispute (*see e.g.* Doc. 42, ¶¶ 29, 30), such arguments go to the amount of damages, if any, to which Plaintiff may be entitled and constitute issues of fact for a jury.  Furthermore, with respect to the second field-trip, the mere fact that Tracey Handling accompanied A.H. to the women's restroom on that school-sponsored trip does not lessen MASD's liability, but rather is a factual consideration that must be considered by the trier of fact when determining what damages, if any, A.H. is entitled to due to the District's unilateral decision that A.H. may not use the women's restroom on school-sponsored field trips absent a parent.

As a result, the record demonstrates that the District's policy discriminates against A.H. on the basis of her gender non-comformity, where, under the District's policy, all

---

[14] In granting in part Ash's motion for preliminary injunction, the lower court in *Whitaker* enjoined the School District from, among other actions, "enforcing any written or unwritten policy against Ash that would prevent him from using the boys' restroom while on school property *or attending school-sponsored events*; [and] disciplining Ash for using the boys' restroom while on school property *or attending school-sponsored events*."  *Whitaker*, 858 F.3d at 1042 (emphasis added).

students except for A.H. can use the restroom corresponding with his/her gender identity. The District has singled-out A.H. and subjected her to intentionally discriminatory treatment where it has purposely excluded her, or attempted to exclude her, from using restrooms on field-trips that all similarly situated students and classmates are permitted to use.

Unlike the District's policy as to A.H.'s use of restrooms on school-sponsored field trips which presents a violation of Title IX, a determination cannot be made as to whether the District violated Title IX when A.H. used only the unisex restrooms at school in first grade. Rather, triable disputes of fact exist with respect to whether a policy existed that A.H. must use the unisex restrooms at school in first grade, and the District's implementation and enforcement thereof, and whether A.H.'s mother consented to the District's approach. These material disputes preclude a finding that the District violated Title IX during A.H.'s first grade year wherein she used the unisex bathrooms at school.

MASD's "accommodation" for A.H., allowing her to use unisex bathrooms at school, would not defeat a Title IX claim for failure to allow her to use the girls' restroom, where this discrimination was solely on the basis of sex. Rather, Courts have repeatedly rejected the argument that Title IX is satisfied when a school provides the transgender student use of a unisex bathroom, if the student is still prevented from using the bathroom corresponding to his/her gender identity. *See Boyertown,* 897 F.3d at 530 ("requiring transgender students to use single user or birth-sex-aligned facilities is its own form of discrimination."). The mere

fact that a transgender student is prohibited from using the bathroom of his/her choice

constitutes the discrimination on the basis of sex, in itself.  As explained in *Whitaker*,

> A policy that requires an individual to use a bathroom that does not conform
> with his or her gender identity punishes that individual for his or her gender
> non-conformance, which in turn violates Title IX. The School District's policy
> also subjects Ash, as a transgender student, to different rules, sanctions, and
> treatment than non-transgender students, in violation of Title IX. Providing a
> gender-neutral alternative [such as gender-neutral bathrooms] is not sufficient
> to relieve the School District from liability, as it is the policy itself which violates
> the Act.

*Whitaker*, 858 F.3d at 1049-1050.  *See also*, *Grimm III,* 302 F.Supp.3d at 747-748 ("the

provision of a gender-neutral alternative is insufficient to relieve a school board of liability,

'as it is the policy itself which violates [Title IX].' Offering restroom alternatives that impose

hardships like unreasonable distances to a student's classroom and increased stigma on a

student is inadequate.")(quoting *Whitaker*, 858 F.3d at 1050) (internal citations omitted);

*Adams*, 318 F.Supp.3d at 1325 (finding that School Board's prohibition of transgender

student from using boys' restroom constituted discrimination on the basis of sex, even

where student was provided the option of using gender-neutral restrooms).  *See also*,

*Boyertown*, 897 F.3d at 530 (rejecting plaintiff's position that the school policy should be

altered "to require that transgender students use individual bathrooms if they do not wish to

use the communal facilities that align with their birth-determined sex", and finding that

"[a]dopting the [plaintiffs'] position would very publicly brand all transgender students with a

scarlet 'T,' and they should not have to endure that as the price of attending their public

school.").

Nonetheless, despite Defendant's assertion that it is entitled to summary judgment because there is purportedly no evidence of discriminatory intent, summary judgment cannot be granted to either party on the events surrounding A.H.'s use of unisex bathrooms in first grade. Rather, the parties strongly dispute the events of the meeting between the school district employees, Tracey Handling, and Dr. Parikh, in May, 2015 prior to A.H. beginning first-grade, as well as what occurred between the commencement of A.H.'s first grade year and May, 2016, when A.H. was allowed to use the girls' bathroom at school. It is thus in dispute whether the District had an unwritten policy specifically precluding A.H., or any other transgender student,[15] from using the restroom corresponding to his/her gender identity, and whether there was ever a request to the school that A.H. be allowed to use the girls' bathroom prior to the May, 2016 Guidance and the Fourth Circuit's decision in *Grimm II* in April, 2016.

Here, as previously set forth, prior to the start of first grade for the 2015-2016 school year, the District provided an opportunity for Mrs. Handling to meet with relevant

---

[15] At some time immediately prior to, or "concurrent with", "the situation with A.H.", there was a student at the MASD high school who was transgender. (Dep. of McBreen, at 18, 30). When asked how he handled the situation, McBreen stated:

> What I had to do is I directed my building principal to sit down and talk to the parents in relation to exactly what I told you just now. And he did that and that's what he discovered. She didn't -- he -- because it was a girl who transitioned to a male. He wanted to use the bathroom in the nurse's room. We offered him to use the bathroom - what bathroom would he feel comfortable using. He decided he wanted to go to the nurse's room and he didn't want to have phys. ed. And they were the only two things that came out of it and everything was smooth sailing. The person graduated.

(*Id*. at 30).

administrators to address any concerns she had for the upcoming year concerning A.H.'s restroom use. (Doc. 39, ¶ 33).  A meeting was held and attended by, among others, Dr. McBreen, Mr. Yacobacci, Mrs. Handling, and Dr. Monika Parikh.  (Doc. 39, ¶ 34; *see also*, Doc. 36-2, ¶ 114).  The parties dispute what was said during the meeting, and specifically whether Mrs. Handling objected to the District's suggestion that the school set aside unisex bathrooms for A.H.'s use.  (*See e.g.*, Doc. 36-2, ¶¶ 115-116, 120, 126; Doc. 43, ¶¶ 115-116, 120, 126; Doc. 39, ¶ 39; Doc. 42, ¶ 39).

Citing to the deposition of McBreen, Plaintiff asserts, which Defendant does not directly dispute in its response to Plaintiff's statement of material fact, that in the Spring of 2015, Mrs. Handling requested that A.H. be allowed to use the girls' bathroom at the Elementary School. (Doc. 36-2, ¶ 112)(citing Dep. of McBreen, at 43:2-10).[16]  Nonetheless, the portion of the deposition cited to by Plaintiff reflects that McBreen's testimony as to when Mrs. Handling made this request is ambiguous.  McBreen stated that in the Spring, prior to A.H. entering first grade, "[A.H.'s] mother had called and asked about . . . her using the bathroom, using the female bathroom."  (*Id*. at 43).  However, when immediately asked again when this was, McBreen responded:

> Right after the Gavin Grimm case came out from Virginia. Not too long, a day or two later after the Grimm situation, she said, I want my daughter to use the female bathroom. She was very content and she was actually extremely happy

---

[16] Although Defendant "admit[s]" this statement of fact, it does so with the explanation that "[p]rior to the start of first grade, 2015-2016, the District provided an opportunity for Plaintiff to meet with relevant administrators to address any concerns she had for the upcoming year concerning A.H.'s restroom use." (Doc. 43, ¶ 112).

and so was Dr. Monika when we talked, we discussed -- this was a collaborative effort. It wasn't us telling her she had to use it. It was a collaborative effort. What are you going to do was basically - what you can [*sic*] do for my daughter was basically the sentiment of the conversation. So we told her, we have this for you. We made it unisex. We made unisex bathrooms on all the floors that all the students could go to. So it was not going to call any attention to her whatsoever. So many students from her class went to that unisex bathroom. So there was no attention called to her at all in regard to that. The mother was very excited about that. And she said, thank you very much, Mr. McBreen . . . thank you for doing your research.

(*Id*. at 44). Notably, the District Court of Virginia did not issue any opinion in *Grimm* until September 17, 2015, and in that opinion, the Court denied the plaintiff's motion for a preliminary injunction and granted the School Board's motion to dismiss the Title IX claim. As later acknowledged by McBreen during his deposition, the Fourth Circuit ruled on an appeal of that decision in April, 2016, wherein the Circuit Court reversed the lower court. *See Grimm II*, 822 F.3d 709 (4th Cir. 2016). Thus, as revealed during McBreen's deposition, it is unclear when Mrs. Handling first specifically requested that A.H. be permitted to use the girls' bathroom at school.

**Q**. And then the Gavin Grimm issue, I guess we can say that now, everybody knows, came during the Dr. Monika meeting [in May, 2015]?

**A**. No. No. No.

**Q**. No?

**A**. No. The Dr. Monika meeting, we made the determination that she was going to use a unisex bathroom. If you remember, during that following year, school year, would be the '15, '16 school year when she was in first grade, okay, when A.H. was in first grade. Midway through the year, probably closer to the end of the year, March, April, maybe, I don't recall, is when the Fourth Circuit Court made a determination in relation to Gavin Grimm.

**Q**. Okay.

**A**. What had happened is after that, a few days later, I got a phone call from Mrs. Handling, I believe she wanted A.H. to use the female bathroom because of that case, that precedent that was set.

(Dep. of McBreen, at 46; *see also*, *id*. at 66-67).

Instead, when specifically asked how the meeting in the Spring of 2015 with "Dr. Monika" was convened and whose idea it was to have a meeting, McBreen responded that he did not know and that "[a]ll I know is that they had asked me to attend. It might have been my idea. They asked me to attend and Dr. Monika was there." (*Id.* at 61). When discussing the meeting in Spring, 2015, McBreen explained,

**A**. . . . And they asked -- and we talked. And [Mrs. Handling] was very, very happy and -- again, she used the word, you are making very reasonable accommodations for this child. That's exactly what she said. Because I sat right next - she was right there and I was right here sitting (*indicating*). And the mom was down at the other end. And actually the mom said to [Dr. Parikh], do you think they're doing - do you think they're making the right accommodations. She said, absolutely. We really handled it with kid gloves. We really did. We tried - to be honest with you, sir, I think we went above and beyond the call of duty for this child, to be honest.

**Q**. So I expect the mother's going to testify that she objected to this plan to set aside unisex bathrooms. If she were to so testify on Tuesday, I assume you would disagree with that?

**A**. In a heartbeat, yes. Absolutely. Because that's not -- sir, that is not the way it went down. It went down -- Monika, who is telling her -- she was taking advice from Dr. Monika and Dr. Monika said, this is a very reasonable accommodation that the school district is making. They're open to it.
And we were. And I was telling her that we did -- that we did research and things like that. And I told the mother, this is brand new to the Minersville School District, let us work through it. And she agreed to that. I said, we're kind of not

really ready for this. I said, but -- to the social issue, but the thing is, we will muddle through and see how we go through. She was fine with that. She was absolutely fine with that. And I know my perception is not that far off.

**Q**. Which perception is that?

**A**. The perception that the mom was in agreement. I know she was in agreement. I sat there. Because again, she was taking advice from Dr. Monika Parikh in regard to that.

**Q**. So if she were to testify that Dr. Monika also did not agree and that they accepted it only because it was the only thing that you were offering, you would disagree with that?

**A**. Yes.

(*Id.* at 61-63).

Similarly, when discussing the meeting between McBreen, Yacobacci, Mrs. Handling, and Dr. Parikh, and the decision that A.H. would use unisex bathrooms at school during first grade, the following exchange occurred between counsel and Yacobacci:

**Q**. . . . did Ms. Handling have any objection to the way you were proposing to handle A.H.'s use of the bathrooms?

**A**. Not at all.

**Q**. So she did not express at that time that she did not agree with that decision?

**A**. That is accurate.

**Q**. Dr. Monika, did she express that she did not agree with that decision?

**A**. No. She said she thought it was a reasonable accommodation.

**Q**. Why do you use the word accommodation with respect to this?

**A**. She used it.

**Q**. She used it?

**A**. I think she used – I think that was her – her phrase was, that seems a reasonable accommodation.

**Q**. So you have no memory that either Dr. Monika or Mrs. Handling expressed that they did not agree, but they were going to go along with it because that's what you were offering, or words to that effect?

**A**. Yeah. No disagreement at all. And the reason I remember that is Dr. McBreen and I discussed afterwards that everything appeared to be in agreement.

(Dep. of Yacobacci, at 92-93). Yacobacci later confirmed that the unisex bathroom was not Mrs. Handling's idea, but denied that she "came in asking for A.H. to be allowed to use the girls' [rest]rooms." (*Id*. at 98-99). He reiterated that "[a]t that meeting with the psychologist, which happened at the end of kindergarten, which happened the prior school year, there was no objection to it." (*Id*. at 100).

In contrast, during her deposition, Mrs. Handling was not asked about a meeting in the Spring of 2015, and instead only briefly referenced a meeting which included herself, McBreen, Yacobacci, and Parikh, prior to the commencement of A.H.'s first grade year, in July, 2015. With respect to that meeting, Mrs. Handling explained:

**Q**. In paragraph 51 of your amended complaint, you state that in or around July 2015 that you again presented a request to the district to allow A.H. to use a women's restroom while at school. And then in paragraph 52 you state that Dr. McBreen and the district denied that request?

**A**. Yes.

**Q**. Tell me about that request and how the district responded to it.

**A**. Dr. McBreen actually was present for that. We went to a meeting at the school to discuss everything. There was a lot of people in the room. And pretty much my request was that she could use -- A.H. would be able to use the female facilities going into first grade. The doctor was with me, like I said, and she had stated that let's see what we could do. And then Mr. McBreen made it clear the only option at that time was the unisex bathroom. And of course, me as a mom, I want my little girl to use the girls' bathroom. So I did request it. However Mr. McBreen did say, let's start off with unisex bathroom and see how it goes. If it doesn't work out we can change it. So it wasn't an option.

(Dep. of T. Handling, at 50-51).

Furthermore, during Dr. Parikh's deposition, she explained that the purpose of the meeting in May, 2015, was "[t]o have a conversation about ways to support [A.H.] at school and in working together and to help the family collaborate and work with the school on supporting [A.H.]." (Dep. of Parikh, at 24). However, Dr. Parikh stated that she did not remember what she recommended or stated during that meeting. (*Id.* at 36-37). Dr. Parikh further stated that, other than the May, 2015 meeting, she did not remember ever having physically met or met-in person any representative of MASD. (*Id.* at 97).

Although Plaintiff also asserts, and Defendant does not dispute, that in or around July 2015, Tracey Handling again presented a request to the School District "to allow A.H. to use a women's restroom while at school" (Doc. 36-2, ¶ 113), Defendant's admission to this statement of fact again explains that "[p]rior to the start of first grade, 2015-2016, the District provided an opportunity for Plaintiff to meet with relevant administrators to address any concerns she had for the upcoming year concerning A.H.'s restroom use." (Doc. 43, ¶ 113).

With respect to other requests by Mrs. Handling throughout A.H.'s first grade year that she be allowed to use the girls' bathroom at school, the evidence is equally in dispute.

According to McBreen, after the meeting in Spring, 2015, he does not remember whether Mrs. Handling asked that A.H. be permitted to use the girls' bathroom prior to the *Grimm* decision in April, 2016. When questioned on this issue, McBreen stated:

> **Q**. And your testimony is that when you told -- that Mrs. Handling had never requested that A.H. be allowed to use the girls' room before the Gavin Grimm situation?
>
> **A**. She may have, sir. I don't remember.
>
> **Q**. And you told me before that you recall that being at the time that the Fourth Circuit decided what was then known as the GG case?
>
> **A**. Uh-huh.
>
> **Q**. As opposed to the District of -- the Eastern District of Virginia?
>
> **A**. Uh-huh.
>
> **Q**. So that's your recollection, it was the later case?
> . . . .
> **A**. Yes.
>
> **Q**. Is that the first time you have a specific memory of Mrs. Handling asking that A.H. be allowed to use the girls' bathroom?
>
> **A**. That's the time where she was the most aggressive with it, that I remember. She was very, very adamant that she wanted her to use the girls' bathroom.

(Dep. of McBreen, at 66-67).

Furthermore, Yacobacci testified at his deposition that the first time he remembered Mrs. Handling requesting that A.H. be allowed to use the girls' restroom was "[n]ot until" the

second field trip.  (Dep. of Yacobacci, at 99).  Yacobacci also stated that he did not have

any memory of Mrs. Handling ever asking that A.H. be allowed to use the girls' bathroom at

school.  As explained by Yacobacci:

> At that meeting with the psychologist, which happened at the end of kindergarten, which happened the prior school year, there was no objection to it. So, I do not recall at all either during the school year. Wasn't until right before the [second] field trip that I became aware of it.

(*Id*. at 100).

However, according to Mrs. Handling, prior to May, 2016, she had "several

conversations with Mr. McBreen since A.H. transitioned about letting her use the girl's

bathroom."  (Dep. of T. Handling, at 37; *see also, id.* at 71 (stating that a week or two before

A.H. was allowed to use the girls' bathrooms at school, she called McBreen "to try to get

him to allow A.H. to use the girls bathroom")).

The current record evidence thus reveals that there are triable disputes of fact as to

whether MASD had a "policy" requiring that A.H. only use the unisex bathrooms at school in

first grade and whether any policy as applied to A.H. was agreed upon between the District

and A.H.'s parents.

However, it must be noted that it is undisputed that following the Fourth Circuit's

decision in *Grimm* in April, 2016, and the 2016 Guidance in May of 2016, the District

immediately allowed A.H. to use the female restrooms.  (*See* Dep. of McBreen, at 66-68

(after Fourth Circuit's decision in *Grimm* and President Obama's letter on May 13, 2016,

McBreen contacted A.H.'s mother on May 16, 2016 and informed her that A.H. "would be

able to use the bathroom that she identifies with starting" the next day); Dep. of T. Handling, at 36-38)). Here, although the District was clearly aware of its alleged discriminatory action – *i.e.* allowing A.H. to use the unisex restroom but allegedly not the girls' bathroom at school – upon receiving notice in mid-2016 that preventing A.H. from using the restroom of her choice may constitute a violation of Title IX, the District voluntarily complied with the case law and federal guidance and instituted prompt corrective measures.

It is for a jury to determine when, and if, Tracey Handling requested that A.H. be permitted to use the female restroom at school prior to April/May of 2016, and whether Mrs. Handling agreed that A.H. should use the unisex restrooms during A.H.'s first grade year, prior to the Fourth Circuit's decision in *Grimm* and the release of the 2016 Guidance.[17]

Finally, although the District contends that "most importantly, Plaintiff cannot point to any emotional and/or physical distress or negative any [*sic*] impact that A.H. may have suffered as a result of any action or inaction by the District concerning her restroom use" (Doc. 38, at 14; *see also, id.* at 15), the record evidence places this argument in dispute and

---

[17] This conclusion is bolstered by McBreen's repeated testimony that he was instructed by the Pennsylvania Department of Education and Pennsylvania School Board Association to handle students with "non-conforming gender identities" on a "case-by-case basis." (*See* Dep. of McBreen, at 25-28). As he therefore explained after being given about a hypothetical situation at school about a male student who then identified as a female, he would "investigate the situation to check on everything that can potentially happen through a broad lens, take a look at it, make a decision, talk to many people, talk to guidance, talk to the principals and talk to parents in relation and try possibly to see if there's anything -- any commonality or any common ground we can come to and then we go from there." (*Id*. at 29). Thus, if after discussing the issue of A.H.'s use of restrooms at school with Mrs. Handling, there was a mutual agreement that A.H. would use the unisex bathrooms during first grade, and Mrs. Handling did not request that A.H. be permitted to use the girls' bathroom at school, the District cannot be found to have intentionally discriminated against A.H. on the basis of her sex.

presents another issue that a trier of fact must resolve.  Contrary to Defendant's position,

Plaintiff has set forth evidence that A.H. may have suffered from anxiety and emotional

stress (*see e.g.*, Dep. of T. Handling, at 73-78), all of which would, if believed, factor into a

decision by the jury as to whether Plaintiff is entitled to damages.

For the aforementioned reasons, Defendant's motion for summary judgment on

Plaintiff's Title IX claim will be denied.

### A.2 – Plaintiff's Motion for Summary Judgment on the Title IX Claim

Plaintiff's brief in support of her motion for summary judgment with respect to the Title

IX claim sets forth the applicable law in some detail but offers little application of that law to

the specific facts of this case.  Nonetheless, as the result of the undisputed material facts set

forth in Plaintiff's statement of material facts and the arguments set forth in other portions of

the supporting brief, and for the reasons set forth by this Court in denying Defendant's motion

for summary judgment as to Count I, Plaintiff's motion for summary judgment on the Title IX

claim will be granted in part and denied in part.  Plaintiff will be granted summary judgment

on the claim that Defendant violated Title IX with respect to its policy regarding A.H.'s use of

public restrooms at school-sponsored events.  However, as set forth, *supra*, issues of

material fact exist as to whether MASD had a "policy" mandating A.H.'s use of unisex

restrooms in first-grade, whether Mrs. Handling ever requested that A.H. be allowed to use

the girls' bathroom at school during her first-grade year prior to April/May, 2016, and thus

whether MASD knew that its accommodation, *i.e.* providing A.H. with unisex bathrooms at

school, was intentionally discriminatory on the basis of A.H.'s sex.[18]

---

[18] Plaintiff also repeatedly notes both in her brief in support of summary judgment and her brief in opposition to Defendant's motion for summary judgment, that the District has no written policy addressing a transgender student's right to use the restroom at school corresponding to his/her gender identity. The lack of a written policy on this issue is not a basis for the imposition of liability on the District. Further, there is evidence of an unwritten policy addressing the use of restrooms by transgender students at school which may now be in effect in the District. McBreen testified that he was instructed by the Pennsylvania Department of Education and Pennsylvania School Board Association to handle students with "non-conforming gender identities" on a "case-by-case basis", and therefore explained that if he was made aware of a situation at school about a transitioning or transgender student, he would "investigate the situation to check on everything that can potentially happen through a broad lens, take a look at it, make a decision, talk to many people, talk to guidance, talk to the principals and talk to parents in relation and try possibly to see if there's anything -- any commonality or any common ground we can come to and then we go from there." (Dep. of McBreen, at 25-28, 29; *see also*, *id.* at 68-69 (stating that if a parent approached him about their child "transitioning" and wanting to use the bathroom corresponding to his/her gender identity, he would evaluate the situation on a "case-by-case" basis and would "probably follow the same thing that I did with A.H." which was to allow her to use the restroom of her choice)); (*see also*, *id.* at 30 (stating that when he learned of a transgender student at the high school, he "directed my building principal to sit down and talk to the parents" and that the student was "offered . . . to use the bathroom - what bathroom would he feel comfortable using."). Although Plaintiff takes issue with the District's decision to evaluate requests on a "case-by-case" basis, the Third Circuit has upheld such an approach, albeit within the confines of a written policy. *See Boyertown*, 897 F.3d at 524 (approving District's policy permitting transgender students to use restrooms and locker rooms consistent with their gender identity and noting that "[i]n initiating this policy, [the School] adopted a very careful process that included student-specific analysis" and that "[p]ermission was granted on a case-by-case basis."). In addition, the absence of a written policy with respect to transgender students' use of restroom facilities at school does not, in itself, constitute discrimination. *Cf. Gebser*, 524 U.S. at 291-292 ("Petitioners focus primarily on Lago Vista's asserted failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims. They point to Department of Education regulations requiring each funding recipient to 'adopt and publish grievance procedures providing for prompt and equitable resolution' of discrimination complaints, 34 C.F.R. § 106.8(b) (1997), and to notify students and others that 'it does not discriminate on the basis of sex in the educational programs or activities which it operates,' § 106.9(a). . . [T]he failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX. Of course, the Department of Education could enforce the requirement administratively: Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, 20 U.S.C. § 1682, even if those requirements do not purport to represent a definition of discrimination under the statute. . . . We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.").

The District has a legal obligation to follow the applicable statutes, case law, and state and federal Guidance as it becomes available. Here, the District has complied with this obligation with respect to A.H.'s use of girls' restrooms at school since 2016. Although there is an issue of fact as to whether the District violated A.H.'s Title IX and Equal Protection rights in first grade when she used the unisex restrooms at

Finally, it is well-established that Courts frequently apply the principles of Title VII cases to Title IX claims. *See*, *e.g.*, *Boyertown,* 897 F.3d at n.103 ("Courts have frequently looked to Title VII authority for guidance with Title IX cases.")(citing *Olmstead v. L.C. ex rel. Zimmring*, 527 U.S. 581, 616 n.1, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)). When analyzing a claim of employment discrimination on the basis of sex under Title VII, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the applicable burden-shifting analysis.

Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of sex discrimination, which requires a showing that: "(1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). "A plaintiff may also meet the last element by showing that the adverse employment action 'occurred under circumstances that could give rise to an inference of intentional discrimination.'" *Id.* (quoting *Makky v. Chertoff*, 541 F.3d

---

school, there is no evidence that her right to use the girls' restroom at school has been violated since May of 2016. Upon notice of the Guidance in May, 2016, it is undisputed that the District immediately began allowing A.H. to use the restrooms at school. The record reflects that this practice remains unchanged. (*See* Doc. 39, ¶ 45; Doc. 42, ¶ 45; *see also*, Dep. of Yacobacci, at 123-124 (explaining that, in the absence of a Federal directive, "there's no plans" to withdraw A.H.'s ability to use the girls' restrooms at the elementary school)). Furthermore, as outlined herein, the case law strongly supports the position that barring a transgender student from using the restroom at school which corresponds to his/her gender identity violates that student's rights under Title IX and the Equal Protection Clause. The District's current approach is therefore in compliance with federal law and this Court's Opinion.

205, 214 (3d Cir. 2008)).  Like other courts, the Third Circuit has ruled that discrimination based on gender stereotypes is sex-based discrimination prohibited by Title VII.  "[A] plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender."  *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 260, 262-264 (3d Cir. 2001) (citations omitted) (further discussing plurality opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989)).  *See also Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 289 (3d Cir. 2009); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 121 (2d Cir. 2018) (finding sexual orientation discrimination is sex-based discrimination prohibited by Title VII, and stating "[w]e now conclude that sexual orientation discrimination is rooted in gender stereotypes and is thus a subset of sex discrimination."); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 346 (7th Cir. 2017) (same, and stating "[o]ur panel described the line between a gender nonconformity claim and one based on sexual orientation as gossamer-thin; we conclude that it does not exist at all.").

In response to Plaintiff's *prima facie* showing, the burden shifts "to offer a legitimate non-discriminatory [justification] for the adverse employment action."  *Burton*, 707 F.3d at 426 (quoting *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)).  "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."  *Id.* (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)).  "At this stage, 'the

defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

If the defendant meets its burden, the burden of production is then shifted back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.* (citing *Fuentes v. Perskie,* 32 F.3d 759, 764-765 (3d Cir. 1994); *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 799-800 (3d Cir. 2003)).

Here, to the extent that a *McDonnell Douglas* analysis is appropriate, as suggested by Plaintiff in her motion for summary judgment (See Doc. 36, at 22-23), application of that burden-shifting analysis also results in a conclusion that while Plaintiff is entitled to summary judgment as to the school's policy with respect to A.H.'s use of the restrooms on school field trips, issues of fact preclude entry of summary judgment in favor of Plaintiff with respect to any "policy" directing A.H. to use unisex restrooms in first grade. However, despite Plaintiff's application of *McDonnell Douglas* in her brief in support of summary judgment, Plaintiff has cited no case, nor has the Court found any, where the burden shifting analysis set forth in *McDonnell Douglas* has been applied in a Title IX case at the summary judgment stage where a student is alleging that a school intentionally discriminated against him or her through a policy solely on the basis of his/her sex. In addition, no case involving a transgender student's right to use the school restroom or locker room facility corresponding to his/her gender identity has incorporated such a legal theory into its

analysis. Nonetheless, to the extent it is relevant, the Court finds the *McDonnell Douglas* analysis does not alter its conclusions herein.

Plaintiff's motion for summary judgment on the Title IX claim will thus be granted in part and denied in part as set forth above.

### B.  Count II – Fourteenth Amendment

The parties further each move for summary judgment on Plaintiff's claim of a violation of the Equal Protection Clause of the Fourteenth Amendment.  Because the parties' arguments in support of their respective motion and in opposition to the other party's motion are very similar and the issues raised therein are significantly intertwined, the Court will consider these cross-motions together.

Although Plaintiff's Title IX and Equal Protection claims are premised on the same underlying factual allegations, Plaintiff is entitled to bring an Equal Protection claim in addition to her Title IX claim given that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights."  *Fitzgerald*, 555 U.S. at 258.  Rather,

> [e]ven where particular activities and particular defendants are subject to both Title IX and the Equal Protection Clause, the standards for establishing liability may not be wholly congruent.  For example, a Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference.  A plaintiff stating a similar claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice.

*Id*. at 257-258 (internal citations omitted).

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate the violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). Section 1983 is not in itself a source of substantive rights, but instead provides a remedy for violations of rights protected by other federal statutes or by the U.S. Constitution. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Therefore, in evaluating a § 1983 claim, a court must first "'identify the exact contours of the underlying right said to have been violated' and . . . determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Nicini*, 212 F.3d at 806 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Here, Plaintiff has claimed that the school has violated her Fourteenth Amendment right to receive the equal protection of the laws.

The Fourteenth Amendment provides, in part, that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend XIV, § 1.[19] This provision "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87

---

[19] The Fourteenth Amendment is fully applicable to public school districts and their employees. *See, e.g., Fitzgerald*, 555 U.S. at 258; *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures"); *Evancho*, 237 F.Supp.3d at 284-285 ("The Equal Protection Clause is fully applicable to this public school district established and maintained under the laws of the Commonwealth of Pennsylvania"). Further, an Equal Protection claim can be based on government policies, including unwritten policies. *See, e.g., Hassan v. City of New York*, 804 F.3d 277, 295 n.5 (3d Cir. 2015).

L.Ed.2d 313 (1985).  Thus, ""[t]o bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiff[ ] must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by other individuals similarly situated."  *Chambers ex rel. Chambers v. Sch. Dist. Of Phil. Bd. of Educ.*, 587 F.3d 176, 197 (3d Cir. 2009) (internal quotation marks and citation omitted).

However, "[t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."  *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). "As a result, the Supreme Court has 'attempted to reconcile the principle with reality' by prescribing different levels of scrutiny depending on whether a law 'targets a suspect class.'" *Evancho*, 237 F.Supp.3d at 284 (quoting *Romer*, 517 U.S. at 631).  When a government policy does not target a suspect class, courts should uphold the "classification so long as it bears a rational relation to some legitimate end."  *Romer*, 517 U.S. at 631.  When a policy "classifies by race, alienage, or national origin," however, it is "subjected to strict scrutiny and will be sustained only if [it is] suitably tailored to serve a compelling state interest."  *City of Cleburne*, 473 U.S. at 440.  Similarly, "classifications based on gender also call for a heightened standard of review," and such a classification will "fail[ ] unless it is substantially related to a sufficiently important governmental interest."  *Id.* at 440-441.

In light of the above, the "first step in evaluating a claim that a law or government action violates the Equal Protection Clause is to determine the appropriate standard of review." *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993). Here, both parties agree that the heightened standard of review, sometimes called the intermediate standard of review, applies.[20] (*See, e.g.*, Doc. 38 at 16; Doc. 40, at 7-8, 9; Doc. 44, at 2-3); *see also, Evancho*, 237 F.Supp.3d at 288 (holding that a classification system based on transgender status requires heightened scrutiny); *Whitaker*, 858 F.3d at 1051 ("[T]he School District's policy cannot be stated without referencing sex, as the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate. This policy is inherently based upon a sex-classification and heightened review applies.").

A "[p]art[y] who seek[s] to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *United States v. Virginia*, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

> The burden of justification is demanding and it rests entirely on the State. The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

---

[20] In *Boyertown*, the Third Circuit recognized that in a number of other cases addressing privacy-rights it had found that the "intermediate standard of review" was appropriate but noted that the lower court in this case had applied a more stringent "compelling interest analysis". 897 F.3d at 528 n. 58. Because the Circuit agreed that the School District's policy at issue "survives the more stringent standard of review", the Circuit declined to decide which standard of review was appropriate.

*Id.* at 533 (internal quotation marks, citations, and brackets omitted).

Thus, the Court will hold that Defendant's bathroom policies do not violate the Equal Protection Clause if MASD can demonstrate an exceedingly persuasive justification for its actions, and that "the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."

In support of its motion for summary judgment, Defendant asserts that Plaintiff has failed to produce sufficient evidence to sustain a claim that the District has violated A.H.'s Equal Protection rights under the Fourteenth Amendment and thus summary judgment should be entered in its favor on Count II. (Doc. 38, at 16). Specifically, Defendant asserts that "without the benefit of any formal guidance from the government until May 2016, the District still made all reasonable efforts [to] accommodate A.H. and protect her privacy" and that "once the federal government issued the formal guidance in May, 2016, the District immediately and without hesitation complied with the guidance and permitted A.H.'s use of the girls' bathroom on a going forward basis." (*Id.* at 17-18). MASD further argues that Plaintiff has failed to demonstrate "any discriminatory intent or purpose on behalf of the District." (*Id.*).

With respect to Defendant's assertion that they are entitled to summary judgment because it did not have "the benefit of any formal guidance from the government" until May, 2016, this Court has already addressed this argument with respect to the Title IX analysis

and rejects it for substantially the same reasons as set forth, *supra*.  In sum, the lack of formal guidance on this specific issue does not preclude liability on Plaintiff's Equal Protection claim.  Defendant has not set forth a single case addressing the issue of transgender students' bathroom rights where a Court has found that the lack of formal guidance precluded liability, in either a Title IX or Equal Protection claim, by the state entity.

The Court thus turns to the two decisions at issue: (1) the decision that A.H. use the unisex bathrooms for the majority of her first grade school year; and (2) the undisputedly unilateral decision by the District that A.H. must use either a unisex, family, or men's restroom on any school fields trips, in the absence of her parent's attendance on the field trip.

Defendant's argument in support of summary judgment does not address, or even mention, the policy applied to A.H. during school-sponsored field trips.  Defendant has failed to set forth any evidence, or argument, to demonstrate an exceedingly persuasive justification for that policy.

The burden of justification for the off-premises restroom policy remains with the defendant here and the District has failed to offer any important governmental objectives to which the discriminatory policy is substantially related for its achievement.  As previously discussed, the District's policy with respect to A.H.'s use of restrooms on school-sponsored field trips intentionally discriminates against A.H. on the basis of her sex.  Thus, the only remaining issue is whether the District has set forth an exceedingly persuasive justification for this sex-based discrimination.  In support of the creation and imposition of the bathroom

policy on field trips, neither McBreen nor Yacobacci provided government objections which can be deemed sufficiently important to justify the policy in place.

When discussing this policy, according to McBreen,

> . . . when you go out in a public building, you go out into the public and you have a child who many perceive as being a boy going into a female bathroom, there may or may not be problems. Again, I wasn't going to take that chance. So I made the decision.

(Dep. of McBreen, at 50). When later asked what his concern was as to which restroom A.H. should be permitted to use on a school field-trip, McBreen explained:

> it was my concern due to the fact that, again, I am responsible for the safety, health and welfare of all of the students. This was a situation that was brand new to the district. It was also brand new to us. There were many -- there were kids in that classroom who went to school with her, her classmates who knew that A.H. was a biological boy and changing her name from [ ] to A.H. So I didn't want to call any concern to it. That was my -- that was my reason why. I didn't want to call attention to the child because it would have been unwanted attention.

(*Id*. at 52-53). When asked if he had any other concerns with respect to A.H.'s restroom use on a field-trip, McBreen further stated:

> Only that it was a school sponsored -- school sponsored event at a public facility. And she was a part of our group. And again, I don't have any – I don't have any control over the public restrooms. So I have to take -- I took every precautionary measure. I don't have any control over them in regard to that. She's out and about and she's representing our school.

(*Id*. at 56-57). McBreen additionally explained that although he did not know what negative impact would result from A.H. using a women's bathroom on a field trip, he was thinking of her safety and privacy, as well as everybody else's. (*Id*. at 57).

According to Yacobacci, in making the decision with McBreen, to the extent that there were not unisex or family restrooms available on school field-trips for A.H. to use, A.H. would have to use the men's bathroom, "but treat it as a private bathroom." (Dep. of Yacobacci, at 65). Specifically, he "didn't want a situation that could endanger A.H., because there's other people in the public who would be going to the bathroom. And I also wanted again to protect the privacy rights of all students." (*Id*. at 66). Yacobacci stated that his safety concern was that "was that someone else in the bathroom may identify her as a biological male and create issues that could create a safety concern for A.H." (*Id*. at 67). Nonetheless, although Yacobacci stated that he made a decision that he thought was in "the best interest", he acknowledged that he did not consider whether A.H. might be uncomfortable using a public men's restroom. (*Id*. at 71). Yacobacci further acknowledged that "[t]he only guidance [on field-trips] was that A.H. would go into the bathroom privately for herself", but that there was no "guidance" with respect to any other student's use of an off-campus public restroom. (*Id*. at 77-78). According to Yacobacci:

> **A**. . . . this was a new situation. And the students were aware that, yes, [A.H.] had identified as a female, but they did not know and understand the situation. So, they were  -- their privacy interests in the bathroom were protected by them using another bathroom.

> **Q**. So the -- from A.H.? From using another bathroom from A.H.?

> **A**. When A.H. was in there, yes.

> **Q**. How was -- what privacy interests did they have of not having A.H. in the bathroom with them?

**A**. Again, a decision was made to protect the privacy issue of all students.

**Q**. Right. My question is, how does that protect the privacy interests of the other students to have A.H. not use the bathroom with them?

**A**. It protects the privacy interests, also, of A.H. when she was in there.

**Q**. How?

**A**. Because she was able to privately use the bathroom.

(Dep. of Yacobacci, at 79).

McBreen and Yacobacci's testimony provides no basis for the grant of summary judgment to MASD because their testimony runs afoul of the admonition in *United States v. Virginia*, that "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." 518 U.S. at 533. Although both administrators discussed protecting A.H.'s privacy, neither administrator took into account how A.H. may feel about having to use a men's restroom, nor did anyone speak to either of A.H.'s parents prior to the first field trip in an attempt to ascertain whether A.H., or her parents as her legal guardians, had any privacy concerns about A.H. using a women's bathroom off-campus. McBreen admitted that "there may *or may not be* problems" if A.H. used the women's bathroom on a field trip (Dep. of McBreen, at 50) (emphasis added), further adding to the speculative basis for his decision. While stating that he was "responsible for the safety, health and welfare of all of the students", McBreen was unable to explain what "problems" may arise if A.H. used the women's bathroom during a field trip

in anything other than generalized terms such as not "want[ing] to call attention to the child". (*Id.* at 52-53). Yacobacci's testimony similarly recounted general privacy concerns for A.H., as well as for other students, but failed to identify with any specificity what those privacy concerns may be or how the privacy interests of A.H., or any other student, may have been infringed upon should A.H. have been permitted to use a public women's restroom. *See e.g. Grimm III*, 302 F.Supp.3d at 751 (finding the School Board's argument that its Policy was substantially related to an important government objective – protecting the privacy rights of all students, including the transgender student – to "ring[] hollow" and to be the result of conjecture).

To the extent that either administrator's stated objectives may be interpreted as setting forth a concern that a member of the public may identify A.H. as a male and create a "safety concern" for A.H. if she used the women's restroom, this justification is deeply flawed. It is undisputed that at the time of the first field trip in kindergarten, when the policy was first implemented, A.H. was dressing in female clothing and presented herself as a female. Therefore, the risk that a member of the public may pose a safety concern to A.H. is arguably significantly higher when a child who by all appearances is female, is required to use a men's restroom.

In addition, there is no evidence that when A.H. was allowed to use the women's bathroom on the second field trip due to her mother's presence, there were any problems or complaints by other students or members of the public. Rather, it is undisputed that during

the second field trip, A.H. used the women's restroom facilities, accompanied by her mother, without incident. (Doc. 36-2, ¶ 156; *see also*, Doc. 39, ¶ 43).

For these reasons, the District has failed to demonstrate an exceedingly persuasive justification for its field-trip policy as it relates to A.H. and to show that the challenged classification serves any important governmental objective and that the discriminatory means employed are substantially related to the achievement of those objectives.[21] Summary judgment will therefore be denied as to the Defendant and granted to the Plaintiff on this portion of her Equal Protection Claim.[22]

The Court next turns to A.H.'s use of unisex bathrooms for the majority of her first-grade year. As previously discussed, issues of fact remain as to whether the District had a policy, whether there was any request that A.H. be permitted to use the girls' bathroom at school that year, and whether the District had notice that A.H. wanted to use the girls' bathroom at that time.

---

[21] With respect to any argument that the policy was justified due to any concerns about other students' privacy, the Court will address the privacy rights of other students, *infra*, when addressing A.H.'s use of the unisex bathrooms in first grade.

[22] Furthermore, unlike A.H.'s use of the bathroom at school in first grade, which has changed in light of the 2016 Guidance, the record is devoid of any facts, or even assertions, that the District's policy that A.H. may not use the women's bathroom on field trips absent a parent has been changed or altered in any way. Thus, while the District asserts that it cannot be held liable for intentional discrimination under the Equal Protection Clause because it permitted A.H. to use the girls' bathroom on an ongoing basis while at school following the 2016 Guidance, this argument has no application to the District's policy dictating which bathroom A.H. can use on field-trips.

With respect to the process in which McBreen engaged when deciding whether A.H. should use a unisex restroom in first grade, McBreen explained:

> I thought it was reasonable at the time just because of the situation that we had and how we were trying to get a handle and looking for direction from many places that we thought we could and we couldn't. So we thought at that particular time, we thought it was a reasonable -- reasonable thing we did.

(Dep. of McBreen, at 65-66). Similarly, Yacobacci asserted that there was "[n]o disagreement at all" between the District and Mrs. Handling and Dr. Parikh as to the decision that A.H. would use unisex bathrooms in first grade, and explained that, in allowing A.H. to use the unisex restrooms, he was trying "to serve her best interest and protect[] her from possible ridicule and the privacy rights of all students." (Dep. of Yacobacci, at 93; *see also*, *id.* at 98 ("We felt it was in the best interest of everybody's rights of privacy, as well as not subjecting her to any ridicule, to have her use the unisex.")).

Here, Plaintiff asserts that she is entitled to summary judgment as "there are no material questions of fact that can disturb the conclusion that AH has suffered a deprivation because of the actions of Minersville School District, and [ ] the District cannot advance any 'exceedingly persuasive' justification for its actions." (Doc. 40, at 3). In support of her motion for summary judgment, Plaintiff asserts that "the only justification offered by Minersville is 'privacy'". (*Id.* at 16). Plaintiff further argues that "unlike every other student, A.H. was underlined required to use the single user restroom" and that "where no single user restroom was available, A.H. was required to use the male designated restroom." (*Id.* at 18) (underline in original). Thus, Plaintiff contends that "the policy denied Equal Protection

because it treats A.H. differently from the rest of the School's students – while the rest of A.H.'s peers may use the restroom that aligns with their gender identity, A.H. was not permitted to do so."  (*Id*.).

To the extent that the District attempts to justify A.H.'s use of the unisex bathroom in first grade as safeguarding the privacy of other students, under the Equal Protection Clause, Courts have repeatedly rejected arguments which assert that allowing a transgender student to use the restroom of his/her choice violates the privacy rights of other students. *See Whitaker*, 858 F.3d at 1052 ("A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing their bodily functions. Or for that matter, any other student who uses the bathroom at the same time.").  *See also*, *Boyertown*, 897 F.3d at 525 (agreeing with the District Court that "even if a cisgender plaintiff had been viewed by a transgender student [in the locker rooms or multi-user restrooms], it would not have violated the cisgender student's constitutional right to privacy."); *id*. at 533 ("the presence of transgender students in these spaces does not offend the constitutional right of privacy any more than the presence of cisgender students in those spaces."); *Parents for Privacy*, 326 F.Supp.3d at 1099 (concluding that "high school students do not have a fundamental privacy right to not share school restrooms, lockers, and showers with transgender students whose biological sex is different than theirs.").

Although, for the reasons previously discussed, the Court agrees with Plaintiff that any argument by the District that it is justified in its actions due to privacy concerns for its students must fail, Plaintiff's own arguments fail to take into account the specific facts at issue here.  First, just as with the Defendant, Plaintiff does not distinguish, as this Court does, between any policy the District may have had relating to A.H.'s use of restrooms at school and her use of restrooms off-campus at school events.  Although, as this Court has previously held herein, the District has not set forth any exceedingly persuasive justification for its mandate that A.H. could not use the women's restrooms on field trips absent her parent's presence, a school's reasoning and justification for allowing a transgender student to use restrooms on and off-campus may differ in light of the number of differences between on-campus and off-campus settings and facilities, and thus must be analyzed separately. Second, while Plaintiff asserts that A.H. was "required" to use unisex or men's restrooms, and was not permitted to use the women's restrooms, whether A.H. was "required" to do so while at school in first grade, and thus whether she was not permitted to use the women's restrooms, remains in dispute.  Although Plaintiff argues that the District's justification related to students' privacy rights "overlooks the very existence of the fact that A.H. would be required to use designated restrooms" whereas "any other student who has privacy concerns ha[s] the option of the single-use restroom or stall if they want greater privacy" (Doc. 40, at 19)(underline in original), there remains a disputed issue of fact as to whether A.H., through her parents, was provided the option of using the unisex restroom and

decided that was the best course of action at that time. What is undisputed is that, since May of 2016, when the 2016 Guidance was published and Mrs. Handling requested that A.H. be permitted to use the restroom corresponding to her gender identity, A.H. has been allowed to do so. Finally, what Plaintiff terms a "policy" as to A.H.'s restroom use at school in first grade may not truly be a "policy" where it is in dispute whether the District required A.H. to use the unisex bathroom or, instead, reached that decision in consultation, and with the approval of, A.H.'s parents.

In addition, in cases such as *Whitaker* and *M.A.B.*, the courts rejected schools' arguments that the Equal Protection Clause did not apply because they were treating all boys and girls the same. The courts rejected this argument in part on the basis that "[t]hese students are disciplined under the . . . policy if they choose to use a bathroom that conforms to their gender identity", *see Whitaker*, 858 F.3d at 1051; *M.A.B.*, 286 F.Supp.3d at 723. Here, there is no evidence that A.H. ever attempted to use the girls' bathroom in first grade, and the record evidence places in dispute whether A.H. ever requested to use the bathroom at school that aligned with her gender identity, whether A.H. even wanted to use the girls' bathroom at school or was more comfortable using the unisex bathroom, and whether she would have been subject to any discipline if she used, or attempted to use, the girls' bathroom. (*See also*, Dep. of Yacobacci, at 89 (stating that although A.H. "was to use the unisex", there was nobody monitoring her use)). In addition, according to Yacobacci, any student could use the unisex bathrooms. (*Id*. at 87).

For the reasons set forth above, no party is entitled to summary judgment as to the alleged policy requiring A.H. to use the unisex bathroom in first grade. The outstanding factual disputes preclude a determination as to whether the decision that A.H. would use the unisex restrooms in first grade at school violates the protections of the Equal Protection Clause. Rather, the disputed evidence of record prevents this Court from determining whether the District, in fact, had a policy, and if so, whether this policy failed to treat all boys and girls the same. The District set forth a proposal for A.H.'s first-grade year, and the parties now dispute whether A.H.'s parent(s) objected to this suggestion, and whether it was in fact a suggestion or rather a mandate.

## C. Permanent Injunctive Relief

Plaintiff further moves for summary judgment on the equitable remedy of a permanent injunction. In support of her motion for "partial summary judgment", Plaintiff only briefly reiterates the request for injunctive relief set forth in her Amended Complaint, stating that she "is seeking preservation of the status quo – that transgendered students may use the facilities matching their gender identity." (Doc. 40, at 24).[23]

---

[23] Plaintiff attached a proposed Order for this Court's approval in connection with her motion for summary judgment. (Doc. 36-1). Approval of Plaintiff's Order would result in this Court issuing a broad permanent injunction which far exceeds the request, and evidence of record, set forth by Plaintiff in her motion for summary judgment and accompanying brief, and is therefore inappropriate. The proposed Order further creates a specific policy that she wants the District to follow in determining "a student's consistently and uniformly asserted gender identity", which is without any explanation or support in Plaintiff's brief in support of summary judgment, and usurps the District's right to create and/or modify a lawful policy which it deems appropriate in determining whether a student is transgender, and if so, what restroom, locker room, or other facilities, and/or accommodations may be available to him/her.

To demonstrate that she is entitled to a permanent injunction, Plaintiff "must show that (1) [she] has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships tips in [her] favor; and (4) granting an injunction would not be against the public interest." *Ne. Penn. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, -- F.3d --, 2019 WL 4437822, at 12 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). "The first two elements typically constitute two sides of the same inquiry, for the availability of adequate monetary damages belies a claim of irreparable injury." *Id.* (internal quotation marks omitted).

Here, Plaintiff's request for injunctive relief is far too broad. Plaintiff has set forth no evidence concerning any other current transgender student at MASD, or the District's treatment of any such student, and the Court is therefore without any basis to grant the sweeping relief requested by Plaintiff – rather, any injunctive relief must be limited to A.H.

In *Adams*, the District Court found that the School Board's policy violated Plaintiff's Title IX and Equal Protection rights and therefore turned to the issue of an appropriate remedy. In that case, the plaintiff "narrowed the scope of his requested injunctive relief from that requested in his amended complaint, and [now sought] to permanently enjoin the School Board 'from enforcing any policy, practice, or custom of the St. Johns County School District that denies transgender students access to and use of restrooms that match a student's gender identity.'" *Adams*, 318 F.Supp.3d at 1326. Although the Court held that Adams was a transgender boy, and therefore "must be permitted to use the boys' restroom

at school", the Court noted that it "had no occasion in the context of this case to determine what threshold of transition, if any, is necessary for the School Board to accommodate other transgender students, nor did the parties ask the Court to do so. The Court received no evidence concerning any other transgender student.  Thus, the injunction that will enter in this case will be limited to the plaintiff, Drew Adams."  *Id*.

Similarly here, while Plaintiff requests that the District be enjoined such that "transgendered students may use the facilities matching their gender identity", Plaintiff has failed to offer any evidence as to any other transgender students in the District, or the treatment of those students, and the record evidence does not provide any support for this Court to enter such a broad injunction.  Furthermore, Plaintiff's request that the Court issue a permanent injunction to preserve the "status quo" erroneously conflates the purpose of a preliminary injunction, which is requested to preserve the status quo pending the outcome of an action and full adjudication on the merits,[24] with the purpose of a permanent injunction.

Nonetheless, the Court having entered partial summary judgment for Plaintiff on the specific issue of the violation by the District of A.H.'s right to use the bathroom corresponding to her gender identity on a field-trip, the Court will enter a permanent injunction restraining the MASD, and its agents and representatives, from refusing or failing to permit A.H. from using

---

[24] *See e.g.*, *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered."); *Univ. of Tx. v. Comenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)(" The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

the bathroom corresponding with her gender identity on field-trips, even in the absence of her parent accompanying her. Plaintiff has satisfied all of the required elements to succeed on a request for a permanent injunction as to this limited issue. The District's refusal to allow A.H. to use the restroom corresponding to her gender identity while on field-trips causes A.H. to suffer irreparable injury for which there is no adequate remedy at law. A.H. has already been prevented from using the women's bathroom on school field-trips and continues to be subject to the District's discriminatory policy on any future field-trips. There is no remedy at law which can cure A.H.'s constitutional or statutory injury or which can give her the relief she seeks. Rather, to receive full relief, she must be allowed to use the restroom corresponding to her gender identity on all school-field trips, regardless of whether her mother is accompanying her. In addition, the District faces minimal, if any, hardship in being enjoined from preventing A.H. from using the women's restroom on field-trips, compared to the hardship that A.H. suffers by being prevented from using the bathroom corresponding to her gender identity. Furthermore, ensuring the enforcement of A.H.'s constitutional and statutory rights cannot be against the public interest.

However, Plaintiff is not currently entitled to a permanent injunction with respect to her request that the Court order that A.H. be allowed to continue to use the girls' restroom at school because she has not succeeded on the merits of her claims at this time.

> Before the Court considers whether plaintiffs are entitled to a permanent injunction, plaintiffs must succeed on the merits of their claims. *See CIBA-GEIGY Corp. v. Bolar Pharm. Co., Inc.,* 747 F.2d 844, 850 (3d Cir.1984) ("In deciding whether a permanent injunction should be issued, the court must

determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof). If so, the court must then consider the appropriate remedy."). If the plaintiff prevails on the merits, then the Court must consider whether "the moving party will be irreparably injured by the denial of injunctive relief," whether "the granting of the permanent injunction will result in even greater harm to the defendant," and whether "the injunction would be in the public interest." *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001).

*Nittany Outdoor Advert., LLC v. Coll. Twp.*, 22 F.Supp.3d 392, 397 (M.D. Pa. 2014). As this

Court has explained throughout the present Memorandum Opinion, issues of fact remain for

trail with respect to whether the District violated A.H.'s federal rights when A.H. only used the

unisex bathroom in first grade. Accordingly, the Court will defer ruing on Plaintiff's request

that the Court issue a permanent injunction directing the District to continue to allow A.H. to

use the restroom at school corresponding to her gender identity.

## V. CONCLUSION

For the foregoing reasons, this Court will deny Defendant's Motion for Summary

Judgment (Doc. 37) and grant in part and deny in part Plaintiff's Motion for Partial Summary

Judgment (Doc. 36) as set forth in this Memorandum Opinion. A separate Order follows.

Robert D. Mariani
United States District Judge